PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION,

         *Plaintiff-Appellant,*

v.

SUNBELT RENTALS, INC.,

         *Defendant-Appellee.*

No. 07-1123

Appeal from the United States District Court
for the District of Maryland, at Greenbelt.
Peter J. Messitte, District Judge.
(8:04-cv-02978-PJM)

Argued: January 30, 2008

Decided: March 31, 2008

Before WILKINSON and GREGORY, Circuit Judges, and
Patrick Michael DUFFY, United States District Judge for the
District of South Carolina, sitting by designation.

Reversed and remanded by published opinion. Judge Wilkinson wrote
the opinion, in which Judge Gregory and Judge Duffy joined.

## COUNSEL

**ARGUED:** Daniel Travis Vail, U.S. EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION, Washington, D.C., for Appellant.
Patricia J. Hill, SMITH, GAMBRELL & RUSSELL, L.L.P., Jackson-
ville, Florida, for Appellee. **ON BRIEF:** Ronald S. Cooper, General

Counsel, Carolyn L. Wheeler, Acting Associate General Counsel, Lorraine C. Davis, Assistant General Counsel, U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Washington, D.C., for Appellant. Colin A. Thakkar, SMITH, GAMBRELL & RUSSELL, L.L.P., Jacksonville, Florida, for Appellee.

---

**OPINION**

WILKINSON, Circuit Judge:

This case arises from a Title VII action brought by the United States Equal Employment Opportunity Commission on behalf of Clinton Ingram, a Muslim American, against Sunbelt Rentals, Inc. The EEOC alleges that Ingram, while working at Sunbelt, was subjected to a religiously hostile work environment in violation of Title VII. The district court granted summary judgment for Sunbelt and dismissed the claim.

Title VII extends the promise that no one should be subject to a discriminatorily hostile work environment. In the wake of September 11th, some Muslim Americans, completely innocent of any wrongdoing, became targets of gross misapprehensions and overbroad assumptions about their religious beliefs. But the event that shook the foundations of our buildings did not shake the premise of our founding — that here, in America, there is no heretical faith. Because the evidence, if proven, indicates that Ingram suffered severe and pervasive religious harassment in violation of Title VII, we reverse the district court's grant of summary judgment and remand with directions that this case proceed to trial.

I.

A.

Sunbelt is a company that rents and sells construction equipment. In October 2001, a month after the September 11th attacks, it hired Ingram to work at its Gaithersburg, Maryland store. After initially working as a truck driver, Ingram was later promoted to the position

of rental manager, a position he held until his termination in February 2003. As a rental manager, Ingram primarily worked at a rental counter located inside the store's showroom and was responsible for assisting customers with equipment rentals.

Ingram worked in close quarters with several other Sunbelt employees. In addition to Ingram, there were three other rental managers at the Gaithersburg location: David Gray, John "Hank" Parater, and Barry Fortna. Gray and Parater had work stations on either side of Ingram at the office's rental counter, and Fortna, the "lead rental manager," worked at a desk behind the counter.

In addition to his fellow rental managers, Ingram frequently interacted with Mike Warner, the store's shop foreman, and Steve Riddlemoser, the overall manager of the Gaithersburg office. When Riddlemoser was not in the office, Warner served as the "acting manager." If both Riddlemoser and Warner were absent, then Fortna was left in charge. The regional manager for the Gaithersburg location was Eddie Dempster.

Prior to joining Sunbelt, Ingram, who is an African American, converted to Islam while serving in the United States Army. It is undisputed that Sunbelt, as well as Ingram's coworkers, knew Ingram was a Muslim. In fact, Sunbelt permitted Ingram to use a private, upstairs room for short prayer sessions that were required by Ingram's faith. In addition, Sunbelt allowed Ingram to attend a weekly congregational prayer session that took place from 1:00-1:45 p.m. on Friday afternoons. Ingram also observed tenets of his faith at the workplace by keeping a beard and wearing a kufi, a traditional headgear worn by Muslim men. Notably, Ingram was the only Muslim employee at the Gaithersburg office.

During his time at Sunbelt, Ingram claims he was subjected to a hostile work environment on the basis of his religion. According to Ingram, the abusive environment was marked by a steady stream of demeaning comments and degrading actions directed against him by his coworkers — conduct that went unaddressed and unpunished by Sunbelt supervisors.

For instance, coworkers used religiously-charged epithets and often called Ingram names such as "Taliban" and "towel head." In addition,

fellow employees frequently made fun of Ingram's appearance, challenged his allegiance to the United States, suggested he was a terrorist, and made comments associating all Muslims with senseless violence. Sometimes Ingram's supervisors personally participated in the harassment. Sunbelt responds, in turn, that Ingram also used profane and derogatory language in the workplace.

Additionally, Ingram was the victim of several religiously charged incidents. For instance, on one occasion, Gray held a metal detector to Ingram's head and, after the detector did not go off, called Ingram a "fake ass Muslim want-to-be turbine wearing ass." In a separate incident, Gray showed Ingram a stapler and said that "if anyone upsets you pretend this stapler is a model airplane [and] just toss it in the air, just repeatedly catch it, [and] don't say anything." Ingram understood this to be a reference to the September 11 attacks and another attempt by Gray to equate Ingram with terrorists. Finally, a cartoon was posted in the store's dispatch area depicting persons "dressed in Islamic or Muslim attire" as suicide bombers. Taking offense, Ingram complained about the cartoon to the dispatcher and eventually tore it down.

In addition to these explicitly religious incidents, Ingram suffered from other forms of harassment. For example, his timecard, which was used to punch time in and out, was frequently hidden, especially on Fridays when he went to congregational prayer. Likewise, coworkers constantly unplugged his computer equipment and, on one occasion, defaced his business card by writing "dumb ass" over his name.

After nearly every incident of harassment, Ingram verbally complained to Riddlemoser, and sometimes Dempster and Warner as well. Indeed, according to Gray, "[w]henever anything that [Ingram] believed to be inappropriate was said or done to him, he immediately took his complaint to Steve [Riddlemoser]." However, these complaints proved futile, and the religious harassment persisted.

On Friday, November 15, 2002, after discovering his timecard was missing, Ingram confronted Warner, who he believed was responsible for the hidden timecard. After a heated exchange, Ingram was sent

home for the day and told that Riddlemoser, who was absent, would deal with the issue when he returned the following Monday.

Later that day, Ingram contacted Sunbelt's Human Resources Department and spoke with HR Specialist Stephanie Wilson. During two phone conversations with Wilson, Ingram expressed his frustration about the ongoing harassment and explained that he believed it was because of his religion. Wilson told Ingram to fax her a written complaint detailing some specific incidents of the alleged harassment.

After receiving Ingram's written complaint, Wilson emailed Riddlemoser to inform him of the situation. She outlined Ingram's complaint of harassment, noting that Ingram alleged that someone was "1) leaving rude written messages (profanity) on his paperwork, 2) unplugging his monitor, 3) misplacing his timecard, [and] 4) voicing physical threats against him to other employees, etc. He believes that this harassment is based on his religion ([M]uslim). He tells me that he has voiced his concerns to you on several occasions and nothing has been done." Wilson also emphasized that these were serious allegations and that discrimination on the basis of religion could not be tolerated under Sunbelt's personnel policies.*

Riddlemoser forwarded the email to Dempster, and both informed Wilson they would look into the matter. The following week Riddlemoser talked with Ingram and his coworkers about the issues alleged in Ingram's written complaint. After investigating the various incidents, Riddlemoser refused to take any disciplinary action because of what he believed to be insufficient evidence about who was responsible for the acts alleged. However, Riddlemoser did tell Ingram's coworkers to avoid making comments about Ingram or Muslims in general.

---

*Sunbelt's anti-harassment policy states that "Sunbelt is committed to maintaining a work environment that is free of discrimination." It also observes that "Sunbelt will not tolerate harassing conduct that affects tangible job benefits, that interferes with an individual's work performance or that creates an intimidating, hostile or offensive working environment."

On November 19, 2002, Riddlemoser reported to Wilson that he had determined the basis of the complaints and that "none of these allegations are religious based." Rather, "they are personal. Clinton's performance and personality are the only cause for the problems. We've allowed him to leave every Friday for an hour to pray due to his religion so I believe we've been very accommodating to him." When asked whether he had spoken to Ingram about these supposed "performance issues," Riddlemoser informed Wilson that he talked with Ingram about his manner and how he should not "take things so personal." Riddlemoser also told Ingram that so long as Ingram "maintains a positive attitude," then the issues with "Sunbelt would roll right off his shoulder and [he] could leave work with the same positive attitude."

Dempster also met with Ingram to discuss the incidents in the written complaint. According to Ingram, Dempster "pre-judg[ed] the situation" and did not even "ask [Ingram] what happened." Rather, Dempster simply informed Ingram that the coworkers alleged to be responsible for the harassment were "denying everything."

After a short period of relative improvement, the religious harassment and pranks "just basically started up again." For instance, Gray continued to harass Ingram about his appearance and his faith. After Ingram informed Dempster that the harassment was "starting to happen again," Dempster accused Ingram of "being paranoid," "seeing things," and "trying to build a case against" Sunbelt. The harassment allegedly continued until Ingram's termination in February 2003.

B.

On May 13, 2005, the EEOC filed an amended complaint on behalf of Ingram alleging that Sunbelt had violated Title VII of the Civil Rights Act of 1964 and Title I of the Civil Rights Act of 1991 by subjecting Ingram to a hostile work environment based on his religion. Specifically, the EEOC claimed that Ingram suffered "pervasive, unwelcome harassment based on his religion," including "demeaning comments about his religious beliefs and practices by Sunbelt employees." In addition, the EEOC alleged that Sunbelt and its managers had notice of the harassment but failed to take corrective action with respect to the hostile working environment.

On December 1, 2006, the district court held a hearing on the motion for summary judgment filed by Sunbelt. At the conclusion of the hearing, the district court issued an oral ruling in favor of Sunbelt. The court held that based on the facts alleged, it did not believe the harassment was severe or pervasive enough to establish a prima facie case of a hostile work environment.

In making this finding, the court emphasized several factors. First, it noted that "[t]here's a lot of coarse behavior that goes on in the workplace," and Sunbelt was "a little more rough and ready than, let us say, the Century Club of New York of which fine ladies are members." Second, the court stated that several of the incidents that Ingram complained about, such as the hiding of his timecard, lacked a direct "nexus with religion." Third, the court explained that if the explicitly religious incidents involving his coworkers were sufficiently severe or pervasive, Ingram would have included them in his written complaint to Human Resources. Because he did not, the district court presumed they must not have been sufficiently severe or pervasive.

In the alternative, the court held that even if the conduct was sufficiently severe or pervasive for the purpose of Title VII, the EEOC had failed to establish a basis for holding Sunbelt liable. The court found that in fact Sunbelt had attempted to address the problems noted in the written complaint. Furthermore, the court dismissed Ingram's contention that he frequently made verbal complaints to Riddlemoser and others but to no avail. According to the district court, "[t]he problem with [allowing] this [argument] is that any number of employees could come in and say, I complained again and again and again. There's a record of a complaint and they didn't do anything, and therefore I made my prima facie case."

The district court entered a final judgment dismissing the EEOC's claims on December 4, 2006. The EEOC appealed the grant of summary judgment on the hostile work environment claim, which we now consider.

## II.

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, condi-

tions, or privileges of employment, because of such individual's . . . religion." 42 U.S.C. § 2000e-2(a)(1) (2000). "Since an employee's work environment is a term or condition of employment, Title VII creates a hostile working environment cause of action." *EEOC v. R&R Ventures*, 244 F.3d 334, 338 (4th Cir. 2001) (citing *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 73 (1986)).

In order to prove that Ingram suffered from a "discriminatorily hostile or abusive work environment," *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993), the EEOC must demonstrate that the harassment was (1) unwelcome, (2) because of religion, (3) sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere, and (4) imputable to the employer, *see Gilliam v. South Carolina Dep't of Juvenile Justice*, 474 F.3d 134, 142 (4th Cir. 2007) (citing *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 183-84 (4th Cir. 2001)). Because the EEOC "seeks here to reverse a grant of summary judgment, it must establish a material dispute of fact with respect to each of the four requirements." *R&R Ventures*, 244 F.3d at 338.

## A.

The "gravamen" of any hostile work environment claim is that the harassment was "unwelcome." *See Meritor*, 477 U.S. at 68. A reasonable jury could determine that the religious harassment here was unwelcome indeed.

To begin, Ingram complained, both verbally and in writing, about the alleged harassment to his supervisors. In fact, according to Gray, Ingram complained to Riddlemoser "[w]henever anything that [Ingram] believed to be inappropriate was said or done to him." Ingram even asked Dempster, the regional manager, whether he could transfer from the Gaithersburg location because of the harassment he endured. Likewise, in his written complaint to Human Resources, Ingram concluded by noting that he was "tired of [the harassment]" and that Sunbelt was "an unhealthy environment to work in."

In addition to lodging these complaints, Ingram made clear to his coworkers that the harassing comments about his religion were unwelcome. For instance, when fellow employees called him "Tali-

ban" or made fun of his beard or headwear, Ingram consistently defended himself and his religion, explaining that he was "not with the Taliban" and that such statements made him "feel very uncomfortable." In fact, Gray explained that part of the reason why coworkers gave Ingram such "a hard time" was "[b]ecause he took it so personally."

But of course the conduct was aimed at Ingram — personally — and it is difficult to see how any employee would welcome derisive behavior directed at his faith. Because Ingram indicated to both management and his coworkers that he found the religiously demeaning conduct to be offensive, the EEOC "has sufficiently alleged that [the] harassment was unwelcome." *Smith v. First Union Nat'l Bank*, 202 F.3d 234, 242 (4th Cir. 2000).

## B.

The EEOC must next establish that the harassment was based on Ingram's religion. In order for a Title VII plaintiff to survive summary judgment, he must present sufficient evidence that the harassing conduct "was motivated by [religious] animosity." *Gilliam*, 474 F.3d at 142-43. Here again the EEOC has met its burden.

Coworkers frequently used religious epithets or other religiously derogatory terms when referring to Ingram. For instance, other Sunbelt employees repeatedly called Ingram "Taliban" or "towel head." These same nicknames would not have been applied to a non-Muslim employee. Moreover, Ingram was consistently teased about his appearance, particularly his kufi and beard. In addition, Ingram testified that Gray often harassed him about his short prayer sessions during work hours. Put simply, there is overwhelming evidence that, as even Gray subsequently admitted, Ingram's "work associates had no respect for [him] being a Muslim" and this was the basis of their conduct.

## C.

The main area of contention here is whether the harassment alleged by Ingram was "sufficiently severe or pervasive to alter the conditions

of [his] employment and create an abusive working environment." *Harris*, 510 U.S. at 21 (quoting *Meritor*, 477 U.S. at 67). Viewed on summary judgment, the evidence establishes that Ingram persistently suffered from religious harassment of the most demeaning, degrading, and damaging sort. The district court erred when it held the EEOC had failed to satisfy this requirement.

1.

The "severe or pervasive" element of a hostile work environment claim "has both subjective and objective components." *Ocheltree v. Scollon Prods., Inc.*, 335 F.3d 325, 333 (4th Cir. 2003) (en banc) (citing *Harris*, 510 U.S. at 21-22). First, the plaintiff must show that he "subjectively perceive[d] the environment to be abusive." *Harris*, 510 U.S. at 21-22. Next, the plaintiff must demonstrate that the conduct was such that "a reasonable person in the plaintiff's position" would have found the environment objectively hostile or abusive. *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81-82 (1998). Because Sunbelt does not, and could not, challenge the EEOC's contention that the harassment seemed severe and pervasive to Ingram personally, we focus our attention on the element's objective component.

This objective inquiry "is not, and by its nature cannot be, a mathematically precise test." *Harris*, 510 U.S. at 22. Rather, when determining whether the harassing conduct was objectively "severe or pervasive," we must look "at all the circumstances," including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 23; *Ocheltree*, 335 F.3d at 333. "[N]o single factor is" dispositive, *Harris*, 510 U.S. at 23, as "[t]he real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed," *Oncale*, 523 U.S. at 81-82.

While this standard surely prohibits an employment atmosphere that is "permeated with discriminatory intimidation, ridicule, and insult," *Harris*, 510 U.S. at 21 (internal quotations omitted), it is equally clear that Title VII does not establish a "general civility code

for the American workplace," *Oncale*, 523 U.S. at 80. This is because, in order to be actionable, the harassing "conduct must be [so] extreme [as] to amount to a change in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). Indeed, as the Court observed, "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Id.* (internal quotations and citations omitted); *see also Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 270-71 (2001).

Our circuit has likewise recognized that plaintiffs must clear a high bar in order to satisfy the severe or pervasive test. Workplaces are not always harmonious locales, and even incidents that would objectively give rise to bruised or wounded feelings will not on that account satisfy the severe or pervasive standard. Some rolling with the punches is a fact of workplace life. Thus, complaints premised on nothing more than "rude treatment by [coworkers]," *Baqir v. Principi*, 434 F.3d 733, 747 (4th Cir. 2006), "callous behavior by [one's] superiors," *Bass v. E.I. DuPont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir. 2003), or "a routine difference of opinion and personality conflict with [one's] supervisor," *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 276 (4th Cir. 2000), are not actionable under Title VII.

The task then on summary judgment is to identify situations that a reasonable jury might find to be so out of the ordinary as to meet the severe or pervasive criterion. That is, instances where the environment was pervaded with discriminatory conduct "aimed to humiliate, ridicule, or intimidate," thereby creating an abusive atmosphere. *Jennings v. Univ. of North Carolina*, 482 F.3d 686, 695 (4th Cir. 2007) (en banc) (citing *Meritor*, 477 U.S. at 65). With these principles in mind, we examine whether a reasonable person in Ingram's position would have found the environment to be sufficiently severe or hostile.

### 2.

The evidence indicates that Ingram suffered religious harassment that was "persistent, demeaning, unrelenting, and widespread." *Harris v. L & L Wings, Inc.*, 132 F.3d 978, 984 (4th Cir. 1997). It is impossible as an initial matter to ignore the context in which the harassment took place. In the time immediately following September 11th, reli-

gious tensions ran higher in much of the country, and Muslims were sometimes viewed through the prism of 9/11, rather than as the individuals they were. Sunbelt's Gaithersburg office was no exception. After the terrorist attacks took place, there was lots of talk amongst Sunbelt employees, especially by Gray, about how the "Muslim religion is bad." Likewise, after it was publicized that the D.C. snipers were Muslim, anti-Islam sentiment rose in the Sunbelt workplace. Ingram, the lone Muslim employee, was left to bear the verbal brunt of anti-Islamic sentiment.

Specifically, Ingram was subject to repeated comments that disparaged both him and his faith. Several coworkers, including one with supervisory authority, referred to Ingram in harshly derogatory terms. Mike Warner, the store's shop foreman, called Ingram "Taliban" "over and over again," as well as "towel head." Likewise, Sal Rindone, a Sunbelt mechanic, told Ingram that he thought Ingram was a member of the Taliban. This same coworker also challenged Ingram's allegiance to the United States, asking Ingram "are you on our side or are you on the Taliban's side," and telling him that if "you don't like America or where we stand, you can just leave." Ingram, a veteran of the United States Army, responded that he was not a member of the Taliban but rather "an American and a Muslim."

In addition, Ingram was persistently harassed about his appearance, particularly his kufi and beard. For example, Warner, when making fun of Ingram's appearance, "would make it known that" he thought Ingram actually "look[ed] like a Taliban." On at least one occasion, Gray called Ingram a "fake Muslim" because of his beard. As Gray later admitted, such "comments were made often." According to Ingram, the harassment by Gray was "an ongoing thing, daily."

Ingram was also harassed about his short, Sunbelt-sanctioned prayer sessions. Gray told Ingram "several times" that he had a "problem" with Ingram leaving his desk to pray. In addition, Ingram's timecard was often hidden on Fridays, the day he went to congregational prayer. Even more severe was a comment made by Warner to another coworker, which was later related to Ingram. Warner said that if he ever caught Ingram praying upstairs, that would be "the end of him."

In addition to the abusive comments made to and about Ingram personally, several coworkers made hostile remarks about Islam gen-

erally. For instance, rental manager Hank Parater told Ingram that the United States should go to Saudi Arabia and "kill them all," referring to Muslims in the Arab world. Parater also said that he wanted to be a Muslim so he could have eight wives. After it was announced on a television in the store's showroom that the D.C. snipers had been apprehended, another coworker stared at Ingram and shouted, "I should have known they were Muslims." Gray admitted that the treatment of Ingram likely stemmed from "the events of September 11th and the sniper attacks in our area."

Ingram was also the object of anti-Muslim crudities that associated Ingram, and the Muslim faith, with violence and terrorism. For instance, one time Gray was carrying a metal detector and, as Ingram walked by, he raised the metal detector to Ingram's head garment. Presumably because the detector did not go off, Gray called Ingram a "fake ass Muslim want-to-be turbine wearing ass." On another occasion, Gray, while holding a stapler in his hand, told Ingram that "if anyone upsets you pretend this stapler is a model airplane [and] just toss it in the air, just repeatedly catch it, just don't say anything." For Ingram, the implication was clear: Gray was trying "[t]o connect me and my religion as terrorists [and] the ones who . . . took the planes that smashed into the buildings September 11th." Finally, a cartoon posted in a main work area depicted several persons "dressed in Islamic or Muslim attire" as suicide bombers. In the cartoon, an instructor with a bomb strapped to his body tells the others: "okay, pay attention" because "I'm only showing you . . . how this works once."

While we must focus primarily "on [Ingram's] personal experience," *Honor v. Booz-Allen & Hamilton, Inc.*, 383 F.3d 180, 190 (4th Cir. 2004), comments made to others are also "relevant to determining whether [Ingram] was subjected to" severe or pervasive religious harassment, *Jennings*, 482 F.3d at 695. For "[w]e are, after all, concerned with the 'environment' of workplace hostility, and whatever the contours of one's environment, they surely may exceed the individual dynamic between complainant and his [coworkers]." *Spriggs*, 242 F.3d at 184; *Jennings*, 482 F.3d at 696. Relevant therefore is the testimony of two Sunbelt customers who support Ingram's assertion that the workplace was permeated with anti-Muslim hostility. Abolhassan Nejati, a Muslim customer of Sunbelt's Gaithersburg office,

testified that Sunbelt employees called him a litany of derogatory names, including "Bin Laden," "Hezbullah," "Ayatollah," "Kadaffi," "Saddam Hussein," "terrorist," and "sun nigger." Nejati also testified that he was called these names "many times," usually by Gray. Another Muslim customer, Aboulaye Komara, explained that during one visit, a Sunbelt employee said "very derogatory things about Muslim people in general," and expressed his belief that "all Muslims are associated with violence."

Ingram also was forced to endure harassment lacking a direct religious nexus. Coworkers frequently hid Ingram's timecard, unplugged his computer equipment, and defaced his business card with terms such as "dumb ass." Although similar pranks were played on other Sunbelt employees, there is evidence suggesting that Ingram suffered such harassment more often than others and more likely because of his religion. For instance, Ingram's timecard was hidden most frequently on Fridays, the day he went to congregational prayer. On the Friday before Ingram filed the written complaint, his timecard was hidden on at least five separate occasions. In light of the extensive, explicitly religious harassment by the same coworkers, a reasonable jury could infer that other harassing incidents were also motivated by a disdain for Ingram's faith.

Sunbelt makes much of the fact that those who participated in the harassment were merely Ingram's coworkers, and not anyone with supervisory authority over him. However, the evidence presented creates at least a triable issue in that regard. Warner, the store's shop foreman and a primary harasser of Ingram's, served as the acting manager whenever Riddlemoser was absent. At the very least, he was viewed as a "higher up" within the office. Similarly, Fortna, the lead rental manager, supervised Ingram's work and even signed the "supervisor" line on Ingram's disciplinary forms. As a result, a jury could infer that the harassment by Warner and Fortna had a greater impact given their supervisory status. *See Faragher*, 524 U.S. at 803.

Likewise, Sunbelt insists the harassment could not have been sufficiently severe because, *inter alia*, it was never "physically threatening." While the presence of "physical threats undeniably strengthens a hostile work environment claim," we have not held that such evidence is required. *White v. BFI Waste Servs.*, 375 F.3d 288, 298 n.6

(4th Cir. 2004). Names can hurt as much as sticks and stones, and the Supreme Court has never indicated that the humiliation so frequently attached to hostile environments need be accompanied by physical threat or force.

While the district court suggested that the harassment might be discounted because the environment was inherently coarse, Title VII contains no such "crude environment" exception, and to read one into it might vitiate statutory safeguards for those who need them most. Of course, if Sunbelt's environment was somehow so universally crude that the treatment of Ingram was nothing out of the ordinary, the jury would be entitled to take that into account. However, the evidence here suggests that the jury could also take the opposite view — that the harassment of Ingram was unique.

Any of the above incidents, viewed in isolation, would not have been enough to have transformed the workplace into a hostile or abusive one. No employer can lightly be held liable for single or scattered incidents. We cannot ignore, however, the habitual use of epithets here or view the conduct without an eye for its cumulative effect. Our precedent has made this point repeatedly. *See Amirmokri v. Baltimore Gas & Elec. Co.*, 60 F.3d 1126, 1131 (4th Cir. 1995) (finding the alleged harassment was sufficiently severe or pervasive because an Iranian plaintiff was called "names like 'the local terrorist,' a 'camel jockey' and 'the Emir of Waldorf'" on an almost daily basis); *White*, 375 F.3d at 297-98 (same); *Spriggs*, 242 F.3d at 182, 185-86 (same); *see also EEOC v. WC&M Enters., Inc.*, 496 F.3d 393, 400-01 (5th Cir. 2007) (same).

Companies cannot, of course, be charged with cleansing their workplace of all offensive remarks. Such a task would be well-nigh impossible, and would encourage companies to adopt authoritarian traits. But we cannot regard as "merely offensive," and thus "beyond Title VII's purview," *Harris*, 510 U.S. at 21, constant and repetitive abuse founded upon misperceptions that all Muslims possess hostile designs against the United States, that all Muslims support jihad, that all Muslims were sympathetic to the 9/11 attack, and that all Muslims are proponents of radical Islam.

If Americans were forced to practice their faith under the conditions to which Ingram was subject, the Free Exercise Clause and the

embodiment of its values in the Title VII protections against work-place religious prejudice would ring quite hollow. Title VII makes plain that religious freedom in America entails more than the right to attend one's own synagogue, mosque, or church. Free religious exercise would mean little if restricted to places of worship or days of observance, only to disappear the next morning at work. In this regard, Title VII helps ensure the special nature of American unity, one not premised on homogeneity but upon the common allegiance to and customary practice of our constitutional ideals of mutual respect.

D.

Fourth, and finally, the EEOC must establish "some basis for imposing liability on" Sunbelt. *Gilliam*, 474 F.3d at 142. Because Ingram notified supervisors about the alleged harassment on numerous occasions, both verbally and in writing, and because Sunbelt failed to take prompt corrective action, we find the agency has satisfied this requirement.

An employer is liable for harassment by the victim's coworkers only "if it knew or should have known about the harassment and failed to take effective action to stop it." *Howard v. Winter*, 446 F.3d 559, 565 (4th Cir. 2006) (quoting *Ocheltree*, 335 F.3d at 334). "Knowledge of harassment can be imputed to an employer if a reasonable person, intent on complying with Title VII, would have known about the harassment." *Ocheltree*, 335 F.3d at 334 (internal quotations omitted). Once the employer has notice, then it must respond with remedial action "reasonably calculated to end the harassment." *Amirmokri*, 60 F.3d at 1131-32; *see also Howard*, 446 F.3d at 570-71.

A reasonable jury could determine that Sunbelt had notice of the religious harassment. Ingram verbally complained to Riddlemoser, the store's manager and Ingram's supervisor, after most of the harassing incidents. Indeed, according to Gray, "[w]henever anything that [Ingram] believed to be inappropriate was said or done to him, he immediately took his complaint to Steve [Riddlemoser]." In fact, Gray thought that, if anything, Ingram complained *too much*: "I don't

think [Ingram's] complaints were really taken seriously because he complained so much."

In addition to these frequent complaints to Riddlemoser, Ingram also complained to Dempster, the store's regional manager. At one point, Ingram even asked Dempster to be transferred to a different location because of the continual harassment he experienced.

Ingram also filed a written complaint with the company's Human Resources Department. This written complaint referenced his earlier verbal complaints ("I made it very clear to the manager this is harassment and I am tired of it.") and provided some examples of harassing conduct. Sunbelt, like the district court, makes much of the fact that the incidents highlighted in the written complaint lacked a direct religious nexus. But this fact is not dispositive for several reasons.

First, when filing the complaint, Ingram made very clear to HR Specialist Wilson that he believed the harassment was because of his religion — a fact Wilson passed on in her report to Riddlemoser and Dempster. Second, Ingram explained that the examples provided in the written complaint were never intended to be an exhaustive list. Rather, given his limited time and his understanding of the directions, he simply wrote about incidents that had happened near the time of the complaint. Third, the written submission cannot be viewed in isolation, but rather in conjunction with the repeated oral complaints.

Based on the evidence presented, and in light of Gray's corroborating testimony, we believe that any doubts espoused by the district court about whether Sunbelt had sufficient notice were misplaced. Evidence of repeated complaints to supervisors and managers creates a triable issue as to whether the employer had notice of the harassment. *See L & L Wings*, 132 F.3d at 982.

We must next determine whether Sunbelt responded with reasonable corrective action. We believe a rational jury could find that it did not. While the requirement of remedial action should not lead an employer to impose baseless sanctions upon its employees, a jury could have reason to believe that this employer in the close quarters of the Gaithersburg office was practicing something akin to willful blindness.

There is scant evidence that Sunbelt, and specifically Riddlemoser, did anything meaningful in response to Ingram's verbal complaints. Despite promises to "get to the bottom" of it, Riddlemoser allowed the harassment to continue. Indeed, there were no sanctions or even reprimands for the religious harassment directed at Ingram. The lone response appears to be Riddlemoser's request that each employee sign a form stating that he would not tamper with Ingram's, or anyone else's, timecard.

Though Sunbelt supervisors did take more corrective action after the written complaint, their response was not sufficient on these facts to warrant summary judgment. Admittedly, there were corrective steps undertaken by Sunbelt. For instance, Riddlemoser warned Ingram's coworkers not to comment on Ingram or Muslims in general. Likewise, both Riddlemoser and Dempster conducted investigations about the specific incidents referenced in Ingram's written complaint.

At the same time, however, Riddlemoser and Dempster failed to take additional action that a rational juror might consider reasonably calculated to end the harassment. Instead, Dempster informed Ingram that everyone was "denying everything" and, thus, there was little he or Riddlemoser could do. Riddlemoser offered little more in the way of comfort, advising Ingram that he simply needed to adopt a more "positive attitude" and let his problems at Sunbelt "roll right off his shoulder."

After Ingram complained to Dempster about the religious harassment starting up again, he was met with accusations of paranoia and litigation. Rather than investigating the matter further or taking any form of corrective action, Dempster dismissed Ingram's complaint and accused him of "being paranoid," "seeing things," and "trying to build a case against" Sunbelt.

The mere existence of an anti-harassment policy does not allow Sunbelt to escape liability. While the "adoption of an effective anti-harassment policy is an important factor in determining whether it exercised reasonable care," the policy must be effective in order to have meaningful value. *Smith*, 202 F.3d at 244; *White*, 375 F.3d at 299-300. Here the existence of the policy might still leave a jury

unconvinced that Sunbelt worked in a serious fashion to combat the rampant harassment in its midst — harassment of which it was repeatedly made aware and which nonetheless continued unabated.

### III.

Because the EEOC has established a genuine dispute of fact with respect to each element of its hostile work environment claim, we reverse the grant of summary judgment and remand the case with directions it proceed to trial. The evidence is such that a jury could see the matter Ingram's way, and it shall have the chance to do so.

*REVERSED AND REMANDED*