**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 09-1134**

CHARLES ALFORD, III,

                    Plaintiff – Appellant,

          v.

MARTIN & GASS, INCORPORATED; SAMUEL G. GASS; ANGLER
CONSTRUCTION COMPANY, L.L.C.,

                    Defendants – Appellees.

Appeal from the United States District Court for the Eastern
District of Virginia, at Alexandria.    Leonie M. Brinkema,
District Judge. (1:08-cv-00595-LMB-TRJ)

Argued: May 13, 2010                    Decided: July 28, 2010

Before KING and DAVIS, Circuit Judges, and C. Arlen BEAM, Senior
Circuit Judge of the United States Court of Appeals for the
Eighth Circuit, sitting by designation.

Affirmed by unpublished per curiam opinion.

**ARGUED**:   Nicholas  Woodfield,  EMPLOYMENT  LAW  GROUP,  PC,
Washington,  D.C.,  for  Appellant.    Michael  Joseph  Pierce,
KASSIMER & ANNINO, PC, Falls Church, Virginia, for Appellees.
**ON BRIEF**: R. Scott Oswald, EMPLOYMENT LAW GROUP, PC, Washington,
D.C., for Appellant.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Plaintiff Charles Alford, III, appeals from the district court's awards of summary judgment to Martin & Gass, Incorporated ("M&G"), and Angler Construction Company, L.L.C. ("Angler"), on Alford's workplace discrimination and negligence claims pursued under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e-17 ("Title VII"); the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("§ 1981"); and Virginia common law. See Alford v. Martin & Gass, Inc., No. 1:08-cv-00595 (E.D. Va. Feb. 25, 2009) (the "Opinion").[1] More specifically, Alford, who is African-American, alleges that M&G and Angler — acting as his joint employers — subjected him to a racially hostile work environment and retaliated against him following his complaints about the harassment. Alford also maintains that Angler negligently retained one of his harassers. As explained below, we are constrained to affirm the district court.

I.

A.

In the mid- to late-1990s, Alford began working as an equipment operator for M&G, a company based in Springfield,

---

[1] The Opinion is found at J.A. 1720-51. (Citations herein to "J.A. ____" refer to the Joint Appendix filed by the parties in this appeal.)

Virginia, that performs heavy construction projects such as road construction and utility installations.[2] After leaving M&G for a short time, Alford rejoined the company as the foreman of a six-member crew in 2004, but subsequently requested to step down as foreman in early 2007.[3] Thereafter, he became the primary operator of M&G's only "crusher," a machine that crushes rocks and concrete to recycle those materials for use in road paving and other projects. M&G sometimes utilized the crusher on its own worksites, but more often leased it to other construction companies. Whenever a company leased the crusher from M&G, an M&G employee was required to report to the lessee's worksite to operate and maintain the machine. Because Alford was the crusher's primary operator, he frequently worked at the various lessees' worksites.

---

[2] The facts spelled out herein are drawn from the summary judgment record created in the district court. We recite these facts in the light most favorable to Alford, as the nonmoving party. See In re Peanut Crop Ins. Litig., 524 F.3d 458, 470 (4th Cir. 2008).

[3] According to Alford, he left M&G in 2003 because of race-based wage disparities but was persuaded to return to the company in 2004. While subsequently serving as foreman, Alford was subjected to racial harassment by a member of his crew. Alford reported the harassment to M&G, which discharged Alford's harasser. Thereafter, other crew members — upset that their coworker was terminated — also began harassing Alford. At that point, in early 2007, Alford reported the further harassment and requested to step down as foreman. Neither the alleged race-based wage disparities nor harassment by fellow M&G employees are the subject of the claims at issue in this appeal.

Between 2006 and 2008, M&G leased the crusher to Angler, an excavating contractor based in Manassas, Virginia, which regularly used the crusher at its Manassas materials recycling yard. Accordingly, Alford often reported to the Angler recycling yard to operate the crusher. While working at the Angler yard, Alford was the only African-American worker there, other than two Angler truck drivers who made brief stops at the yard for loading several days a week and an M&G fuel truck driver who was there for about thirty minutes each day to service the crusher. Because he worked at the yard only on days that Angler needed the crusher there, Alford sometimes spent several days or weeks away from the yard working at other locations, including another Angler worksite.

While working at the Angler recycling yard in late 2007 and early 2008, Alford was subjected to a series of racist incidents. According to Alford, various Angler employees — including two individuals, Kenneth McDonald and Gordon Sutton, whom he describes as his supervisors — "constantly made racial jokes" in his presence. J.A. 823. More specifically, Alford recounted the following incidents:

- McDonald "made comments about [Alford] such as 'Black people like Dr. Pepper'";

- Sutton "asked [Alford] on several occasions, 'How do you get into that Black skin?'";

4

- Sutton once "used the word 'nigger' in conversation with [Alford]";

- In approximately December 2007, Sutton "tried to scare [Alford] by running around with a white cloth on his head with eyeholes cut out, as if he were wearing a Ku Klux Klan hood";

- In early 2008, when Alford attempted to instruct an Angler worker on the use of an excavator leased from M&G, "[t]he worker became angry and deliberately swung a large rock around with the machine in a threatening manner, nearly hitting [Alford]"; and,

- On another occasion in 2008, "an Angler worker attached a large Confederate flag to his green SUV and glared at [Alford] as [the worker] slowly drove by."

Id. It is uncontested that Alford did not contemporaneously report this conduct of McDonald, Sutton, or the other Angler employees to any higher-level representatives of Angler or M&G, including Jack Hazel, president of Angler, or Samuel Gass, owner and president of M&G. Alford explained that, although he was offended by the incidents, he "tolerated the insults and did not report them because [he] needed the job." Id. Nevertheless, Alford also acknowledged that he was comfortable speaking — and indeed had spoken — to both Hazel and Gass about workplace issues, and that Hazel had provided his cell phone number to Alford at Alford's request.

On Friday, February 29, 2008, after having spent more than a week operating the crusher at the other Angler worksite,

Alford reported to the recycling yard at about 12:35 p.m. to run the crusher there. Approximately thirty minutes after his arrival, Alford noticed a noose hanging from a piece of equipment approximately five feet from where he normally parked his truck and twenty feet from where the crusher was positioned. Inside the noose was a piece of black drainage pipe protruding from the hood of a black sweatshirt. Alford interpreted the display as "a crudely-constructed [effigy depicting] a black man with a hangman's noose around his neck." J.A. 823. About twenty minutes after noticing the noosed effigy, Alford showed it to Steve Hoffman, the African-American fuel truck driver for M&G, who had just arrived at the Angler yard. Alford and Hoffman agreed that the effigy was "'not funny,'" and Hoffman reiterated an earlier warning to Alford (first made shortly after Alford began working at the Angler yard) that the Angler employees "'didn't want [Alford] working around them.'" Id. at 319.

According to Alford, he next reported the noosed effigy to McDonald and asked him to remove it. McDonald "seemed unconcerned," J.A. 823, and "said he was busy right then, [and that he would] be out in a little bit," id. at 321. McDonald also asked Alford if the effigy offended him, and Alford responded, "Of course." Id. Alford then took photographs of the effigy, unsuccessfully attempted to contact M&G's Gass by

6

telephone without leaving a message, and completed his shift at the Angler yard, working until about 4:00 p.m. McDonald had removed the effigy about an hour after Alford reported it, and sometime later (that day or the following Monday, March 3, 2008) remarked to Alford, "I guess you're going to have Al Sharpton out here." Id. at 321-22.

During the morning of Monday, March 3, Alford appeared at M&G's office, where he reported the noosed effigy to Gass and showed him photographs of it. According to Alford, he "was upset" and Gass "was very upset." J.A. 324. Alford provided Gass with the cell phone number for Angler's Hazel, and Gass called Hazel outside Alford's presence. Gass then arranged for Alford to meet Hazel at the Angler yard, where Alford waited in a private area while Hazel investigated the noose incident.[4]

Hazel's investigation promptly revealed that three white Angler employees — Ernest Lease, Jeffrey "Craig" Lease, and Gary Wolfe — had erected the noosed effigy about a week prior to its discovery by Alford. According to Hazel, the employees told him

---

[4] Gass provided the only evidence that, during their conversation that morning about the noose incident, Alford reported prior incidents of racial harassment by Angler employees. According to Gass, he asked Alford if there had been prior incidents, and Alford responded "that there'd been a lot of joking around going on" for months. J.A. 868. Gass then asked why Alford had not reported such conduct, and Alford said he "didn't feel like there was anything to report" because "[w]e were all joking around." Id.

that "they had put [the noose] there purely because they were just fooling around and didn't use their head." J.A. 392. Notably, in January 2008, approximately six weeks before the noose incident, Craig Lease was involved in a workplace physical altercation with another white Angler employee; Lease and the other employee each had been suspended for three days.

Immediately after speaking on March 3 with the three employees responsible for the noosed effigy, Hazel assured Alford that the employees were sorry for the noose incident and that such conduct would not recur. At some point that day, Ernest Lease apologized to Alford on behalf of the three employees. According to Alford, he called Gass from the recycling yard and said he was "'going to work the rest of the day and see how it goes.'" J.A. 327. Alford was satisfied with Hazel's response to the noose incident, as reflected by Alford's later acknowledgement that he did not "know if [Hazel] could have done anything [more]." Id. Furthermore, according to Gass, Alford related during their March 3 phone conversation that "the situation was resolved to his satisfaction." Id. at 372. Hazel also called Gass and assured him that the incident was horseplay and that the three employees did not mean any harm to Alford or anyone else. Gass did not inquire into the details of what Hazel had done to address the situation but was satisfied that the problem had been resolved, based on Hazel's

8

and Alford's representations.  Gass also spoke with Hoffman, the M&G fuel truck driver who serviced the crusher, who reported experiencing no problems at the Angler yard.

Hazel directed Richard Athey, Angler's safety officer, to conduct "a follow-up investigation with the same individuals . . . [t]o make sure that [Athey] had the same information that [Hazel] had."  J.A. 396.  According to Athey, the three employees responsible for the noose incident told him they had no racist intent and that the noose was not directed at Alford or any other African-American worker.  Craig Lease explained that he had recently watched a movie involving a hangman's noose and that Wolfe was merely showing Ernest Lease and him how to tie such a knot.  Each of the three employees asserted that the figure inside the noose was a horse or donkey that the employees called "Pedro," and was not intended to depict a hanged black man.  See id. at 1009.  Athey thus concluded that the incident was an inappropriate joke between the three employees and nothing more.  Notably, Athey made handwritten notes of his interviews of the three employees, either during or immediately after each interview, but claimed to have lost the notes within the next week.  Accordingly, Angler failed to produce Athey's interview notes to Alford in these proceedings.  The record contains, however, copies of written warning notices given by Athey to the three employees on March 3.  The notices state:

9

> Employee was involved in an inappropriate joke. A hangman's noose was made & hung at the end of the wood processor, which offended an employee from Martin & Gass (Charlie _____) running a crusher in our yard. All involved have apologized and assured Mr. Charlie that this was not done directed at him or anyone and that it would never happen again.

See id. at 401-03. The notices advise that "termination of employee" would result "should incident occur again." See id.

Nevertheless, according to Alford, after returning to work in the recycling yard during the afternoon of March 3, he was subjected to threatening behavior by Angler employees. More specifically, an employee — apparently Wolfe — drove a loader near Alford "in a threatening motion," "[s]winging the machine back and forth, like [it was] going to hit [Alford's] truck." J.A. 328. Additionally, several employees "walked by and glared at [Alford] angrily." Id. at 824. Alford called Gass that afternoon to report that he "was very uncomfortable in trying to work [at the Angler yard]" and was planning to contact the police. Id. at 328. According to Alford, Gass responded "that he didn't have anything else for [Alford] to do if [he] wasn't working [at the Angler recycling yard]." Id.[5] It is undisputed

_____

[5] Alford contends that Gass did not offer him any alternative positions at M&G. Gass claims, however, that he immediately inquired as to other available M&G positions for which Alford would be suitable, and offered Alford a position as a rubber tire loader operator at an M&G worksite — albeit at $20.00 an hour, $7.30 less than Alford's pay rate for operating the crusher.

10

that Alford did not inform Gass or anyone else at M&G that Angler employees had engaged in threatening behavior following the investigation of the noose incident. Additionally, Alford did not report any such threatening behavior to Hazel or Angler.

After leaving the Angler recycling yard on March 3, Alford "was so stressed that [he] passed out twice before [he] got home" and "almost had an accident." J.A. 330. Alford "fe[lt] that [he] was being punished because [he] reported [the noosed effigy]," and he believed that he no longer had a job. Id. at 331. That evening, Alford filed a report with the Prince William County Police Department.[6] The next day (Tuesday, March 4), Alford made an appointment to see a doctor. That morning, Gass called Alford to ask whether he intended to return to work, and Alford answered "no" and stated that he had a doctor's appointment. Id. at 332. Gass suggested that Alford use vacation time for the remainder of the week to consider what he wanted to do, and Alford agreed. Gass called again the following Monday, March 10, and Alford advised that he was

---

[6] The Prince William County Police Department investigated the noose incident as a possible hate crime (and notified the FBI of same), prompting Angler to call a meeting of all recycling yard employees to explain the seriousness of the noose incident and to direct cooperation with the authorities. There is no evidence in the record, however, as to the results of the police (or any FBI) investigation.

"still under doctor's care."  Id. at 333.  Alford has not worked for M&G since that time.

B.

On June 6, 2008, Alford initiated this action in the Eastern District of Virginia.  On October 10, 2008, he filed a second amended complaint — the operative complaint herein — alleging that M&G and Angler had violated Title VII and § 1981 by subjecting him to a racially hostile work environment (the "hostile work environment claim") and by retaliating against him after he complained about the harassment (the "retaliation claim").[7]  Alford also alleged, under Virginia common law, that Angler had negligently retained employee Craig Lease (the "negligent retention claim").  Finally, Alford asserted several claims under the Fair Labor Standards Act against M&G and Gass (the "FLSA claims").

On January 2, 2009, following extensive discovery, the parties filed cross-motions for summary judgment.  In relevant part, M&G moved for summary judgment on some of the claims against it, seeking relief on the hostile work environment and

_____

[7]  In a separate count of the second amended complaint, Alford also asserted that M&G and Angler had subjected him to racial discrimination by failing to prevent or correct the harassment.  Because this claim alleges conduct identical to the hostile work environment claim, we do not consider it as constituting a separate cause of action.

12

retaliation claims, but not the FLSA claims; Angler moved for summary judgment on all claims against it, i.e., the hostile work environment, retaliation, and negligent retention claims; and Alford sought summary judgment on his hostile work environment and retaliation claims against M&G and Angler and the negligent retention claim against Angler alone. On January 16, 2009, the district court conducted a hearing on the parties' summary judgment motions and disposed of them from the bench, granting M&G's and Angler's motions and denying Alford's motions. Thereafter, on February 25, 2009, the court issued its written Opinion, further explaining the summary judgment rulings. Alford has timely appealed, and we possess jurisdiction pursuant to 28 U.S.C. § 1291.[8]

---

[8] Notably, the district court's January 16, 2009 summary judgment rulings disposed of all claims against Angler, but not M&G (which, along with Gass, yet faced the FLSA claims). On February 2, 2009, in an effort to enable Alford to pursue an immediate appeal, the district court granted the parties' joint request for certification that the judgment for M&G on the hostile work environment and retaliation claims was final. See Fed. R. Civ. P. 54(b) ("When an action presents more than one claim for relief . . . , the court may direct entry of a final judgment as to one or more, but fewer than all, claims . . . only if the court expressly determines that there is no just reason for delay."). Normally, we would be obliged to review the sufficiency of the Rule 54(b) certification to confirm the existence of appellate jurisdiction. See, e.g., Culosi v. Bullock, 596 F.3d 195, 203 (4th Cir. 2010) (dismissing appeal pursued under Rule 54(b) where "district court failed to specify any reasons for certifying [it]"). While this appeal was pending, however, the remaining FLSA claims against M&G (and Gass) were resolved — with Alford prevailing before a jury and (Continued)

II.

We review de novo a district court's award of summary judgment, viewing the facts and inferences reasonably drawn therefrom in the light most favorable to the nonmoving party. See In re Peanut Crop Ins. Litig., 524 F.3d 458, 470 (4th Cir. 2008). Summary judgment is appropriate only if the record reflects "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

III.

On appeal, Alford contends that the district court erred in awarding summary judgment to M&G and Angler on the hostile work environment and retaliation claims, and to Angler on the negligent retention claim. Alford also suggests that the court erred in denying his summary judgment motions with respect to the same claims. We assess the court's rulings on these claims in turn.[9]

_____

being awarded $23,587.20 in compensatory and liquidated damages and $71,158.53 in costs and attorneys' fees. In these circumstances, we possess jurisdiction under § 1291 — without any need for a proper Rule 54(b) certification — because there is a final judgment as to each of Alford's claims.

[9] Prior to the deadline for filing a responsive appellate brief, Angler's lawyers moved in this Court — with the consent
(Continued)

14

A.

As for his hostile work environment claim, Alford seeks relief for the noose incident perpetrated by co-workers Ernest Lease, Craig Lease, and Wolfe, as well as for the pre-noose incident conduct of alleged supervisors McDonald and Sutton. Importantly, the elements of a hostile work environment claim are the same under Title VII and § 1981. See Spriggs v. Diamond Auto Glass, 242 F.3d 179, 184 (4th Cir. 2001). The plaintiff must establish, to avoid summary judgment for the employer, that a reasonable jury could find harassment that was "(1) unwelcome; (2) based on race; and (3) sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere." Id. at 183. Additionally, "even if the record supports the conclusion that a triable issue exists with regard to each of these three elements, [the plaintiff] may not prevail absent sufficient evidence of a fourth element: that there is some basis for imposing liability on [the employer]." Id. at 184 (internal quotation marks omitted).

_____

of Angler and the other parties — to withdraw as counsel due to Angler's nonpayment of outstanding attorneys' fees. The motion explained that Angler was insolvent after recently ceasing operations and liquidating its assets, and intended to rely in this appeal on the summary judgment papers and record from the district court and any favorable portions of M&G's appellate brief. We granted the withdrawal motion by Order of August 19, 2009.

15

In granting summary judgment to M&G and Angler on the hostile work environment claim, the district court assumed that Alford had established the first three elements of such a claim with respect to the noose incident, see Opinion 17-18 (accepting that the noose incident, "by itself, could constitute severe and pervasive conduct because of the deeply hurtful meaning of a noose to African-Americans"), but not the pre-noose incident conduct, see id. at 29 (deeming "[m]ost of the prior incidents, while offensive, [to be] in the nature of simple teasing, offhand comments, and isolated incidents" (internal quotation marks and alteration omitted)). The court further concluded, with respect to all of the alleged harassment, that Alford could not satisfy the fourth element of his hostile work environment claim — namely, some basis for imputing liability to either M&G or Angler.

On the fourth element, the parties disagreed over the applicable standard. M&G and Angler contended that, because all of Alford's alleged harassers were his coworkers (rather than supervisors), the court should apply the standard utilized in EEOC v. Sunbelt Rentals, 521 F.3d 306 (4th Cir. 2008). Under this standard, "[a]n employer is liable for harassment by the victim's coworkers only if it knew or should have known about the harassment and failed to take effective action to stop it."

16

Sunbelt Rentals, 521 F.3d at 319 (internal quotation marks omitted).

By contrast, Alford urged the court to deem M&G and Angler vicariously liable for the alleged harassment unless they could satisfy the Faragher/Ellerth affirmative defense. See Faragher v. City of Boca Raton, 524 U.S. 775 (1998); Burlington Indus., Inc. v. Ellerth, 524 U.S. 742 (1998). This standard, which applies where the harasser was a supervisor but the plaintiff suffered no tangible employment action, allows the employer to avoid liability only "if it can demonstrate, by a preponderance of the evidence, that (1) it exercised reasonable care to prevent and correct promptly any harassing behavior; and (2) the plaintiff unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." White v. BFI Waste Servs., LLC, 375 F.3d 288, 299 (4th Cir. 2004) (internal quotation marks omitted). In assessing "whether a harasser was the plaintiff's supervisor, the critical question [is] 'whether the particular conduct was aided by the agency relation.'" Whitten v. Fred's, Inc., 601 F.3d 231, 244 (4th Cir. 2010) (quoting Mikels v. City of Durham, 183 F.3d 323, 332 (4th Cir. 1999)). "[H]arassment by employees with only 'some measure of supervisory authority' could be aided by the agency relation," but that supervisory authority must be more than "'the occasional authority to direct

17

[the plaintiff's] operational conduct while on duty.'" Id. at 245 (quoting Mikels, 183 F.3d at 332).

With respect to the noose incident, the district court observed that it was undisputed that such incident was perpetrated by Alford's nonsupervisory coworkers and, thus, that the Sunbelt Rentals standard controlled. Applying this standard, the court determined that "[t]he evidence in the record clearly establishes that Angler responded reasonably to the noose incident." Opinion 26. The court explained, in relevant part, that "Hazel personally went to the yard and interviewed the employees on the same day he learned of the noose incident. Athey also interviewed those responsible and each was reprimanded and given both oral and written warnings that future inappropriate conduct would result in termination." Id. Similarly, the court concluded that M&G could not be held liable for the noose incident "because it took appropriate remedial action once put on notice." Id. at 18. In so concluding, the court rejected Alford's assertion that M&G's response was inadequate because it relied on Angler to end the harassment rather than conducting its own investigation. As the court observed, "[t]here is no evidence in the record that would have caused Gass to believe that Hazel — who himself went promptly to the yard, spoke to the employees and Alford, and

18

reprimanded the employees — was being disingenuous.  Moreover, Alford told Gass he was satisfied." Id.

In addressing the pre-noose incident conduct of McDonald and Sutton, the district court rejected Alford's theory that M&G and Angler — absent satisfaction of the Faragher/Ellerth defense — were vicariously liable for McDonald's and Sutton's conduct because they were Alford's supervisors.  Alford relied on evidence "that he viewed [McDonald and Sutton] as in charge of the yard, and in particular viewed McDonald as the foreman." Opinion 28.  The court observed, however, that "whether or not they supervised other Angler employees, McDonald and Sutton clearly had no supervisory authority over Alford." Id.  Rather, "[a]t most, by telling him what stones to crush, McDonald had 'occasional authority to direct [Alford's] operational conduct.'" Id. (quoting Mikels, 183 F.3d at 334 (alteration in original)).  In these circumstances, the court concluded, Alford was obliged to satisfy the Sunbelt Rentals standard for imputing liability for McDonald's and Sutton's harassment to M&G and Angler.  And — because Alford "never reported any of these incidents" to Angler, id. at 27, and merely "alluded to the past incidents" when reporting the noose incident to M&G, id. at 17; see also supra note 4 — there was no basis for holding M&G or Angler liable for the pre-noose incident conduct.

19

Although we are willing to assume that Alford has established the first three elements of his hostile work environment claim with respect to both the noose incident and the pre-noose incident conduct, we agree with the balance of the district court's analysis outlined above. Accordingly, we affirm the court's summary judgment awards to M&G and Angler on Alford's hostile work environment claim.

B.

Next, on his retaliation claim, Alford contends that M&G and Angler subjected him to retaliatory harassment after reporting the noose incident — thereby bringing about his constructive discharge. See Burlington N. & Santa Fe Ry. v. White, 548 U.S. 53, 67-68 (2006) (holding that, to prove "actionable retaliation," "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse"). Alford points to the harassing conduct of Angler employees: McDonald made the "Al Sharpton" comment; another employee (apparently Wolfe) drove a loader near Alford in a threatening manner; and several other employees glared angrily at Alford as they walked by him. In support of his retaliation claim, Alford contends that "Angler deliberately retaliated against [him] through its supervisors' and employees' taunting Alford and threatening him with physical harm," and that M&G "deliberately retaliated against [him] by failing and

20

refusing to assign work to [him] in any location other than the hostile work environment that persisted at the Angler worksite." Br. of Appellant 45-46.

Unfortunately for Alford, even assuming that the alleged retaliatory harassment was sufficiently severe to be actionable, there is no basis for imputing liability for such harassment to M&G and Angler. Significantly, Alford has conceded that he never reported the harassment to M&G or Angler, and he has not otherwise shown that either defendant was aware of it. Indeed, the record reflects that — as far as M&G and Angler knew — the noose incident was the last act of harassment perpetrated against Alford at the Angler yard, and that incident had been resolved. Although, after the retaliatory harassment occurred, Alford informed Gass that he "was very uncomfortable in trying to work [at the Angler yard]," J.A. 328, Alford did not explain that his discomfort resulted from fresh acts of retaliatory harassment rather than the prior racial harassment that had already been addressed. As such, "there are no facts in evidence that support any deliberate efforts by M&G to force [Alford] to quit." See Opinion 20-21 (citing Matvia v. Bald Head Island Mgmt., Inc., 259 F.3d 261, 272 (4th Cir. 2001), for the proposition that "[c]onstructive discharge requires that an employer deliberately make an employee's working conditions intolerable in an effort to induce him to quit"). Furthermore,

21

Angler cannot be held vicariously liable for the retaliatory harassment, because there is no evidence that it was perpetrated by supervisory employees. See id. at 30. We therefore affirm the district court's summary judgment awards to M&G and Angler on Alford's retaliation claim.

C.

Finally, on his negligent retention claim, Alford contends that Angler negligently retained Craig Lease following his January 2008 workplace physical altercation with another white employee. Under Virginia law, an employer may be "subject to liability for harm resulting from the employer's negligence in retaining a dangerous employee who the employer knew or should have known was dangerous and likely to harm [others]." Se. Apartments Mgmt., Inc. v. Jackman, 513 S.E.2d 395, 397 (Va. 1999). The harm suffered by the plaintiff must be a foreseeable result of the negligent retention. See, e.g., Blair v. Defender Servs., 386 F.3d 623, 628-30 (4th Cir. 2004); Se. Apartments Mgmt., 513 S.E.2d at 397-98. Alford contends that, following Craig Lease's January 2008 altercation, "Angler knew Lease was dangerous and likely to harm others, yet it retained his employment" — thereby "creating an unreasonable risk of harm to Alford," who, "because of his race," was threatened by Lease. Br. of Appellant 47-48.

22

The district court concluded that — even "[a]ssuming that a noose-hanging can constitute the 'harm' necessary to trigger a negligent retention claim under Virginia law" — Alford's claim "fail[ed] because the harm caused by Lease was not a foreseeable result of Angler's decision to retain him" following the January 2008 altercation. Opinion 31. The court explained that "[t]his altercation in no way put Angler on notice that Lease might engage in a racially discriminatory act such as a noose-hanging." Id. at 32. We are constrained to agree and thus affirm the court's award of summary judgment to Angler on Alford's negligent retention claim.

IV.

Pursuant to the foregoing, we affirm the district court's summary judgment awards to M&G and Angler.[10]

AFFIRMED

_____

[10] In these circumstances, we conclude that the district court properly denied Alford's cross-motions for summary judgment, which were largely premised on the contention that M&G and Angler were not entitled to the Faragher/Ellerth defense, in part because of Angler's spoliation of evidence (safety officer Athey's interview notes). Furthermore, we affirm the summary judgment awards to M&G and Angler without addressing the court's other grounds for such awards, including its ruling that Angler was not Alford's "employer" for purposes of Title VII.

23