**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

In Re: PEANUT CROP INSURANCE
LITIGATION, MDL-1634

---

MARVIN TAYLOR BARNHILL; JOEY
WATFORD; TOM CLEMENTS; FLORIDA
PEANUT FARMERS, and others
similarly situated; TERRY E.
BEASLEY; WALLACE A. BERRY, South
Carolina Peanut Farmer and others
similarly situated; TEXAS PEANUT
FARMERS, in the Southwest Growing
Region; GEORGIA PEANUT FARMERS;
CHARLES E. SMITH, JR.,
                    *Plaintiffs-Appellees,*

            v.                              No. 07-1145

ANN VENEMAN, Secretary of
Agriculture for the United States of
America; ROSS J. DAVIDSON,
Administrator for Risk Management
Agency; RISK MANAGEMENT AGENCY;
UNITED STATES DEPARTMENT OF
AGRICULTURE; UNITED STATES OF
AMERICA; FEDERAL CROP INSURANCE
CORPORATION; MIKE MOORE, RMA
Regional Office Director Valdosta;
RON BERRYHILL, RMA Regional
Office Director, Oklahoma City,
Oklahoma,
                    *Defendants-Appellants.*

In Re: PEANUT CROP INSURANCE
LITIGATION, MDL-1634

---

MARVIN TAYLOR BARNHILL; JOEY
WATFORD; TOM CLEMENTS; FLORIDA
PEANUT FARMERS, and others
similarly situated; TERRY E.
BEASLEY; WALLACE A. BERRY, South
Carolina Peanut Farmer and others
similarly situated; TEXAS PEANUT
FARMERS, in the Southwest Growing
Region; GEORGIA PEANUT FARMERS;
CHARLES E. SMITH, JR.,
                *Plaintiffs-Appellants,*

                    v.

ANN VENEMAN, Secretary of
Agriculture for the United States of
America; ROSS J. DAVIDSON,
Administrator for Risk Management
Agency; RISK MANAGEMENT AGENCY;
UNITED STATES DEPARTMENT OF
AGRICULTURE; UNITED STATES OF
AMERICA; FEDERAL CROP INSURANCE
CORPORATION; MIKE MOORE, RMA
Regional Office Director Valdosta;
RON BERRYHILL, RMA Regional
Office Director, Oklahoma City,
Oklahoma,
                *Defendants-Appellees.*

No. 07-1146

Appeals from the United States District Court
for the Eastern District of North Carolina, at Greenville.
Malcolm J. Howard, Senior District Judge.
(4:05-cv-00008-H; 4:02-cv-00159-H; 4:05-cv-00002-H;
4:04-cv-00191-H; 4:04-cv-00189-H; 4:04-cv-00188-H;
4:04-cv-00187-H; 4:04-cv-00186-H; 4:06-cv-00164-H;
4:06-cv-00163-H; 4:06-cv-00129-H)

Argued: December 5, 2007

Decided: May 8, 2008

Before WILKINSON and KING, Circuit Judges, and
Henry F. FLOYD, United States District Judge for the
District of South Carolina, sitting by designation.

---

Vacated and remanded by published opinion. Judge King wrote the
opinion, in which Judge Wilkinson and Judge Floyd joined.

---

**COUNSEL**

**ARGUED:** Jeffrey A. Clair, UNITED STATES DEPARTMENT OF
JUSTICE, Washington, D.C., for Appellants/Cross-Appellees. Robert
Daniel Boyce, BOYCE & ISLEY, P.L.L.C., Raleigh, North Carolina,
for Appellees/Cross-Appellants. **ON BRIEF:** Peter D. Keisler, Assis-
tant Attorney General, George E. B. Holding, United States Attorney,
Rudolf A. Renfer, Jr., Assistant United States Attorney, Eric Goulian,
Assistant United States Attorney, Scott R. McIntosh, UNITED
STATES DEPARTMENT OF JUSTICE, Washington, D.C., for
Appellants/Cross-Appellees. Gordon E. Boyce, BOYCE & ISLEY,
P.L.L.C., Raleigh, North Carolina, for Appellees/Cross-Appellants.

**OPINION**

KING, Circuit Judge:

These appeals relate to lawsuits being pursued by several classes of peanut farmers (the "Farmers") who insured their 2002 peanut crops under a Multiple Peril Crop Insurance Policy (the "MPCI Policy") that, under federal law, was issued by private insurers and reinsured by the Government.[1] After suffering heavy losses to their 2002 peanut crops, due primarily to a severe drought during the growing season, the Farmers filed claims under the MPCI Policy. They were indemnified for their losses at a "non-quota" rate of 17.75 cents per pound — rather than at the claimed "quota" rate of 31 cents. The Farmers' expectations of indemnity at the 31 cent quota rate were premised largely on the Government's allocations of peanut poundage quotas in previous years. However, federal farm legislation enacted in May 2002 eliminated the peanut quota program that had been in effect in some form since 1941. *See* Farm Security and Rural Investment Act of 2002, Pub. L. No. 107-171, §§ 1301-1310, 116 Stat. 134, 166-83 (2002) (the "2002 Farm Bill").

After the Farmers were indemnified at the 17.75 cent non-quota rate for their 2002 crop losses, they initiated a series of civil actions against the Government in several federal jurisdictions, alleging, inter alia, that the MPCI Policy had been breached and that their due process rights had been violated.[2] The district court eventually had before it a district-wide class action on behalf of the Farmers situated in the Eastern District of North Carolina, as well as several other district-wide class actions first initiated in other jurisdictions and then transferred to the Eastern District of North Carolina by the Multi-District Litigation Panel (the "MDL Panel"). In disposing of the Farmers'

---

[1]A copy of the MPCI Policy is found at J.A. 40-59. (Citations herein to "J.A. ___" refer to the contents of the Joint Appendix filed by the parties in this appeal.)

[2]The Farmers initiated their lawsuits against multiple defendants, including the Secretary of Agriculture, the Administrator of the Risk Management Agency, the Department of Agriculture, the United States, the Federal Crop Insurance Corporation, and others. We refer to the defendants collectively as the "Government."

contentions, the court, on July 22, 2004, certified a district-wide class action on behalf of the Farmers in the Eastern District of North Carolina (the "North Carolina case"). The court then awarded summary judgment to those Farmers on their breach of contract claims. *See Barnhill v. Davidson*, No. 4:02-cv-00159-H (E.D.N.C. July 22, 2004) (the "SJ Opinion").[3] On March 31, 2005, the court entered an order establishing a formula to be used in computing damage awards. *See In re Peanut Crop Insurance Litigation*, No. 4:05-cv-00008-H (E.D.N.C. Mar. 31, 2005) (the "Damages Order").[4] On March 31, 2005, and again on December 20, 2006, the court extended its SJ Opinion (including the class certification ruling), as well as its Damages Order, to the lawsuits brought by the Farmers in other jurisdictions (the "MDL cases"). *See In re Peanut Crop Insurance Litigation*, No. 4:05-cv-00008-H (E.D.N.C. Mar. 31, 2005) ("MDL Order I"); *In re Peanut Crop Insurance Litigation*, No. 4:05-cv-00008-H2 (E.D.N.C. Dec. 20, 2006) ("MDL Order II").[5]

On December 20, 2006, the district court entered Final Judgment on the Farmers' breach of contract claims, pursuant to Rule 54(b) of the Federal Rules of Civil Procedure.[6] The Government has appealed, contending, inter alia, that the court erred by (1) concluding that the MPCI Policy obligated the insurers to indemnify the Farmers at the 31 cent quota rate in the absence of 2002 peanut poundage quota allocations having been made to individual farms; and (2) determining that the Government's failure to allocate such quotas breached the MPCI Policy, based on the court's conclusion that the enactment of the 2002 Farm Bill hindered the performance of the Government's statutory duty to allocate such quotas. The Government also contends that the court erroneously premised its SJ Opinion, in part, on the Farmers' alternative theory of detrimental reliance. The Farmers have cross-appealed, asserting that the district court erred in failing to certify a nationwide class of farmer-plaintiffs, and also in denying the requests of certain plaintiffs for transfers of venue. As explained

---

[3]The SJ Opinion can be found at J.A. 237-85.

[4]The Damages Order can be found at J.A. 295-302.

[5]The MDL Order I can be found at J.A. 303-07, and the MDL Order II can be found at J.A. 362-67.

[6]The Final Judgment can be found at J.A. 368.

below, we disagree with the district court's breach of contract ruling, and thus vacate its SJ Opinion and remand.

## I.

In order to properly assess these appeals, we first review the background of the federal crop insurance and peanut quota programs.[7] We then examine the relevant provisions of the MPCI Policy and the 2002 Farm Bill. Finally, we relate the procedural history of this litigation, as well as the appellate contentions of the parties.

## A.

Although crop insurance under the MPCI Policy is provided by private insurers, it is reinsured by a governmental entity called the Federal Crop Insurance Corporation (the "FCIC"), pursuant to the Federal Crop Insurance Act, 7 U.S.C. §§ 1501 *et seq.*[8] The FCIC is a wholly owned government corporation that operates under the umbrella of the Department of Agriculture (the "USDA"), and it is statutorily responsible for regulating the crop insurance industry. *See Tex. Peanut Farmers v. United States*, 409 F.3d 1370, 1372 (Fed. Cir. 2005). The FCIC is itself regulated by the USDA's Risk Management Agency (the "RMA"). *Id.* As specified by Congress, the FCIC's pur-

---

[7]Although various terms have been used in the record, sometimes interchangeably, we refer to the components of the peanut price support program as follows. First, we refer to the general price support program at issue as the "peanut quota program." We use the term "national poundage quota" to describe the total peanut poundage quota set by the United States Department of Agriculture for the entire country, and we refer to the peanut quota allocations made to individual farms as the "farm poundage quota."

[8]Section 1508(j) of Title 7 provides that, if a "claim for indemnity is denied by the [FCIC] or an approved provider, an action on the claim may be brought against the [FCIC] or Secretary [of Agriculture] only in the United States district court for the district in which the insured farm is located." 7 U.S.C. § 1508(j)(2). The various public officials and entities named as defendants in this litigation are apparently proper parties thereto, pursuant to the MPCI Policy and § 1508(j) — and the parties have made no contention to the contrary.

pose is "to promote the national welfare by improving the economic stability of agriculture through a sound system of crop insurance." 7 U.S.C. § 1502(a). The crop insurance program implements the public policy of protecting farmers from the risks associated with drought, flood, and other natural disasters. 7 U.S.C. § 1508(b). The basic coverage provisions of crop insurance protect insured farmers against catastrophic risk, and serve to indemnify those farmers on losses in excess of 50% of the crop's normal yield, indemnified at 55% of the crop's expected market price. 7 U.S.C. § 1508(b); 7 C.F.R. § 402.1. Pursuant to the governing provisions of the crop insurance program, insured farmers are also entitled to purchase additional insurance coverage at a greater percentage of their expected yields. 7 U.S.C. § 1508(c).

Prior to 2002, the extent to which the MPCI Policy indemnified lost or damaged peanut crops varied, depending on whether the insured crops were designated as "quota" or "non-quota" peanuts, as defined by the peanut quota program. This peanut quota program was recently addressed and described by the Federal Circuit in *Members of the Peanut Quota Holders Ass'n v. United States*, 421 F.3d 1323 (Fed. Cir. 2005) (concluding that 2002 Farm Bill's changes in quota program did not result in compensable taking under Fifth Amendment). That court's description of the background of the program is helpful, and was spelled out, in part, as follows:

> In the 1930s the United States' economic depression particularly affected the agricultural community. Congress, in an attempt to mitigate the effects of the depression on agricultural products, enacted the Agricultural Adjustment Act of 1938 ("AAA"), ch. 30 tit. III, § 301 *et seq.*, 52 Stat. 31, 38, which regulated the production and sale of tobacco and wheat within the United States. The statute instituted acreage allotments to prevent oversupply of the targeted agricultural commodities. In 1941, the AAA was amended to include farm acreage allotments for peanuts. The Agricultural Adjustment Act of 1938, *as amended*, ch. 39, tit. III, §§ 357-359, 55 Stat. 88, 88-91 (the "1941 Act"). The 1941 Act sought to regulate the production of peanuts to avoid severe fluctuations in price caused by rapid changes in market demand and the year-long lag in response to that demand

caused by crop growing cycles. 1941 Act, 55 Stat. at 88. Since 1941, Congress has regulated peanut production primarily through quotas set by the Secretary of Agriculture . . . but the nature and reach of the quota system has not remained constant.

*Peanut Quota Holders Ass'n*, 421 F.3d at 1325-26. The peanut quota program was, prior to 2002, a price support system for each year's peanut crop. "Quota" peanuts were peanuts used for domestic edible consumption, whereas "non-quota" peanuts (a/k/a "additional peanuts" or "excess peanuts") were either crushed or exported. Non-quota peanuts had a lower value than quota peanuts, and, in the crop years preceding 2002, the vast majority of peanuts grown by the Farmers were quota peanuts.

The value of quota peanuts and the related national poundage quota for such peanuts in a specific crop year were determined by the USDA.[9] Farm poundage quota allocations to individual farms were made by the Farm Service Agency (the "FSA"), which administers the price support programs of the USDA. During the crop years immediately preceding 2002, quota peanuts lost due to covered occurrences were indemnified at the rate of 31 cents per pound, and non-quota peanuts lost due to such occurrences were indemnified at a 16 cent rate. The peanut quota program thus supplied the MPCI Policy with the value per pound of both quota and non-quota peanuts, and those values were used for determining the applicable coverage and indemnification rates. Based on whether — and to what extent — farm poundage quotas were allocated to individual peanut farms, these rates were used to calculate the allowable indemnification for peanut crop losses under the Policy.

### B.

### 1.

The coverage provisions of the MPCI Policy were published in the Federal Register and are codified in Title 7 of the Code of Federal

---

[9]Because the peanut quota program was repealed by the 2002 Farm Bill, we refer to it in the past tense.

Regulations. *See* 7 C.F.R. §§ 457.1 *et seq.* The USDA, acting through the RMA and the FCIC, is responsible for satisfying certain deadlines and for general oversight of the MPCI Policy. *See* 7 U.S.C. §§ 1501 *et seq.* The MPCI Policy also imposes certain obligations on insured farmers. The following MPCI Policy terms relate to dates and deadlines that are pertinent to these appeals:

- All changes to the MPCI Policy's coverage provisions, price elections, coverage limits, premium rates, and program dates must generally be made prior to a "contract change date." The Policy defines the "contract change date" as the "calendar date by which we make any policy changes available for inspection in the agent's office." MPCI Basic Policy ¶ 1. For the 2002 crop year, the contract change date was November 30, 2001.

- Price elections can be offered after the contract change date, so long as they are offered no later than fifteen days prior to the "sales closing date," and are not less than those available on the contract change date. MPCI Basic Policy ¶¶ 3(e) & 4(b). The MPCI Policy defines the "sales closing date" as "a date contained in the Special Provisions by which an application must be filed. The latest date by which you may change your crop insurance coverage for a crop year." *Id.* ¶ 1. The sales closing date, which varied from state to state, was February 28, 2002, for the Farmers in the North Carolina case.[10]

- The "cancellation date," or the date on which coverage would automatically renew unless cancelled in writing, was also February 28, 2002, in North Carolina.[11] After

---

[10]The sales closing dates for the MPCI Policy in the various districts outside North Carolina were in or about February 2002. For example, the sales closing date in Virginia was March 15, 2002.

[11]The cancellation dates provided by the MPCI Policy were as follows: January 15, 2002, for certain counties in Texas; February 28, 2002, for certain other counties in Texas and all states not otherwise mentioned; and, March 15, 2002, for New Mexico, Oklahoma, Virginia, and the remaining Texas counties.

the cancellation date, the Farmers were bound by the MPCI Policy and could neither rescind nor alter it.

- The "earliest planting date" for North Carolina Farmers was April 16, 2002. The MPCI Policy defines the "earliest planting date" as the "earliest date established for planting the insured crop." MPCI Basic Policy ¶ 1.

- The North Carolina Farmers had until the "final planting date" of May 31, 2002, to plant their peanut crops. The "final planting date" is the "date contained in the Special Provisions for the insured crop by which the crop must initially be planted in order to be insured for the full production guarantee or amount of insurance per acre." MPCI Basic Policy ¶ 1.[12]

2.

The MPCI Policy includes several other provisions and definitions that are pertinent to an understanding of these proceedings, including:

- The MPCI Policy defines "price election" as the "amounts contained in the Special Provisions or an addendum thereto, to be used for computing the value per pound . . . for the purposes of determining premium and indemnity under the policy." MPCI Basic Policy ¶ 1. The price election is generally based on the FCIC's projection of market prices for a given commodity. 7 U.S.C. § 1508 (c)(5) & (6).

- The MPCI Policy required each insured Farmer to file an annual "acreage report" detailing the peanut crop acreage to be planted by the farm and the "effective poundage marketing quota, if any, that is applicable" to an individ-

---

[12]Farmers outside North Carolina were also required to plant their peanut crops in the Spring of 2002. For example, Virginia Farmers had an initial planting date of April 11, 2002, and a final planting date of June 10, 2002.

ual farm for the current crop year. MPCI Policy Peanut
Provision ¶ 6.

- The term "effective poundage marketing quota" is
important with respect to this litigation and federal crop
insurance, and is defined by the MPCI Policy as the
"number of pounds reported on the acreage report as eli-
gible for the average support price per pound . . . not to
exceed the Marketing Quota established by [the FSA] for
the farm serial number." MPCI Policy Peanut Provision
¶ 1.

- The MPCI Policy defines "quota peanuts" as "[p]eanuts
that are eligible to be valued at the average support price
per pound." MPCI Policy Peanut Provision ¶ 1. "Non-
quota peanuts," in turn, are simply defined as "[p]eanuts
other than quota peanuts." *Id.*

- The "production guarantee" is defined in the MPCI Pol-
icy as the "number of pounds . . . determined by multi-
plying the approved yield per acre by the coverage level
percentage you elect." MPCI Basic Policy ¶ 1.

The MPCI Policy provides that "[t]he maximum pounds that may
be insured at the quota price election" are the lesser of "the effective
poundage marketing quota," or the "insured acreage multiplied by the
production guarantee" — but, to the extent that the resulting figure
"exceeds the effective poundage marketing quota, the difference will
be insured at the non-quota peanut price election." MPCI Policy Pea-
nut Provision ¶ 3(b). Although the MPCI Policy explains how quota
peanuts are insured, it also authorizes and provides for coverage
where lost or damaged crops do not involve quota peanuts. For exam-
ple, the MPCI Policy makes reference to the "effective poundage mar-
keting quota, *if any*." *Id.* ¶ 6. In calculating the maximum poundage
that may be insured as quota peanuts, the MPCI Policy looks to the
lesser of the effective poundage marketing quota, on the one hand, or
the insured acreage multiplied by the production guarantee, on the
other. If, with respect to an insured farm, the insured acreage multi-
plied by the production guarantee exceeds the effective poundage
marketing quota, the difference is insured and indemnified at the non-

quota rate only. If an insured farm has not been allocated an effective poundage marketing quota, its entire insured acreage, multiplied by the production guarantee, would exceed a quota allocation of zero and the entire production would be insured at the non-quota rate. Thus, when an annual farm poundage quota allocation for an insured farm is "zero," none of that farm's peanut production is insured at the quota rate.

The MPCI Policy similarly provides for the calculation of indemnity in the event that part or all of a Farmer's lost crops are non-quota peanuts. Specifically, the indemnity formula provides that the value of lost or damaged peanuts is computed by first multiplying the insured acreage by the production guarantee per acre. MPCI Policy Peanut Provision ¶ 14(c). The second step of this indemnity formula requires the effective poundage marketing quota of the farm to be subtracted from the resulting sum, to determine the amount of insured quota and non-quota peanuts (the amount in excess of the effective poundage marketing quota is the amount of non-quota peanuts). *Id.* After determining the amount of insured quota and non-quota peanuts, those amounts are multiplied by their respective price elections. Thus, in the event a farm poundage quota allocation is not made to a farm with an insured crop, the MPCI Policy provides that the loss to be indemnified must be determined on the basis of the price election for non-quota peanuts. *Id.*

C.

On November 30, 2001 (the contract change date), an addendum to the MPCI Policy was issued and made effective. The addendum provided that losses suffered by 2002 crop year peanuts would be indemnified at 31 cents per pound for quota peanuts and 16 cents per pound for non-quota peanuts (as they had been indemnified for the previous several years). Two weeks later, on December 14, 2001, the USDA announced a national poundage quota for peanuts for the 2002 crop year, at the same level as the 2001 national poundage quota. The USDA announcement stated that the "2002-crop national poundage quota will be allocated to each state based on the state's share of the 2001-crop national poundage quota." J.A. 75. This announcement, however, also alerted the Farmers to the possibility that the peanut

quota program for the 2002 crop year could be altered or eliminated by statute. Specifically, it advised that:

> The Farm Bill currently being considered by Congress would dramatically change the peanut program. Poundage quotas would be eliminated and price support would be replaced with a target price and deficiency payment plan. *If pending legislation is enacted as law, the 2002 poundage quota and price support announced by this release may be altered or rescinded.*

J.A. 75 (emphasis added). As noted, this USDA announcement was made two weeks after the contract change date of November 30, 2001. On January 15, 2002, the USDA announced that the national poundage quota for peanuts would remain the same in 2002 and "will be allocated to eligible quota and non-quota farms." J.A. 77. This announcement again warned, however, that:

> The Farm Bill currently being considered by Congress would change the peanut program. Poundage quotas would be eliminated and price support would be replaced with a target price and deficiency payment plan. *If pending legislation is enacted as Law for 2002, the 2002 poundage quota announced according to this notice will be altered or rescinded.*

J.A. 78 (emphasis added). As these USDA announcements forecast and warned, the FSA did not allocate farm poundage quotas to individual farms in 2002. Instead, on May 3, 2002, the FSA directed its county offices not to allocate any such quotas to individual peanut farms for 2002. Ten days later, on May 13, 2002, the President signed into law the 2002 Farm Bill, which, inter alia, repealed the FSA's statutory authority to allocate farm poundage quotas to peanut farms and substantially and materially altered the federal crop assistance program for peanut farmers.

In the place and stead of the peanut quota system, the 2002 Farm Bill provided for several programs: continued price supports through non-recourse loans at rates substantially below the quota rates; a program of direct payments to farmers; a new price support program of

payments triggered by the rise and fall of market prices; a marketing quota buy-out program; and a mandated increase — from 16 cents to 17.75 cents per pound — in the price election for non-quota peanuts, to be used to compute premiums and indemnity payments under the 2002 MPCI Policy. 2002 Farm Bill § 1310(c).[13]

On May 28, 2002, in response to the major statutory revisions made by the 2002 Farm Bill to the peanut quota program, the USDA sent a bulletin to the crop insurance companies, advising them that all 2002 peanuts were to be treated as non-quota peanuts for purposes of the MPCI Policy in the 2002 crop year. Accordingly, all indemnities made pursuant to the MPCI Policy for 2002 peanut crops were made at the non-quota rate of 17.75 cents.[14]

## D.

Unfortunately, the Farmers' 2002 peanut crops suffered heavy losses and damages, primarily due to a severe drought during the growing season. When they filed their claims for indemnification under the MPCI Policy, the Farmers were informed that their losses

---

[13]Section 1310(c) of the Farm Bill provides, in pertinent part, that:

(c) Treatment of crop insurance policies for 2002 crop year —

(1) Applicability — This subsection shall apply for the 2002 crop year only notwithstanding any other provision of law or crop insurance policy.

(2) Price Election — the non-quota price election . . . shall be 17.75 cents per pound and shall be used for all aspects of the policy relating to the calculations of premium, liability and indemnities.

[14]Thus, while the Farmers were bound to the MPCI Policy on February 28, 2002, and were obligated to plant their peanut crops between April 16 and May 31, 2002, the 2002 Farm Bill repealed the peanut quota program on May 13, 2002. This enactment occurred subsequent to the date when the Farmers were entitled to withdraw from the MPCI Policy or able to reevaluate the planting of their 2002 peanut crops — although the Farmers had twice been placed on notice by the USDA (on December 14, 2001, and, again on January 15, 2002) of likely changes to the peanut quota program.

would only be indemnified at the non-quota rate of 17.75 cents per pound, although they had been expecting indemnification at the 31 cent quota rate. Indeed, quota peanuts had usually constituted a majority of the Farmers' annual crops. When their claims for indemnification at the 31 cent rate were denied, the Farmers initiated this series of lawsuits, alleging that the MPCI Policy had been breached and that the Government had violated their due process rights.

1.

The North Carolina case was filed on November 19, 2002, "on behalf of all peanut farmers in North Carolina and Virginia who are eligible for the Multiple Peril Crop Insurance Policy for crop year 2002 and are similarly situated to the named Plaintiffs." J.A. 11. Put succinctly, the complaint sought declaratory, injunctive, and compensatory relief, and requested that the proceeding be certified as a class action. It alleged that the Government had breached the MPCI Policy by the unilateral and untimely modification of its coverage terms, and asserted that the Government had violated the Farmers' due process rights by, inter alia, arbitrarily and capriciously altering the Policy by unilateral and retroactive action.

In ruling on the class certification issue in its SJ Opinion, the district court certified a class of insured Farmers whose farms were situated within the Eastern District of North Carolina and who had been assigned farm poundage quotas for the 2001 crop year. *See* SJ Opinion 11-23. The court concluded, however, pursuant to § 1508(j) of Title 7, that it lacked jurisdiction over insured Farmers whose farms were situated outside the Eastern District of North Carolina, and thus excluded them from the certified class. *Id.* at 12, 19.[15]

The district court then proceeded to address the parties' cross-motions for summary judgment, and ruled in favor of the Farmers on

---

[15]As noted above, § 1508(j) of Title 7, as relied upon in the SJ Opinion, provides that if a "claim for indemnity is denied by the [FCIC] or an approved provider, an action on the claim may be brought against the [FCIC] or Secretary [of Agriculture] only in the United States district court for the district in which the insured farm is located." *See supra* note 8.

the merits of their breach of contract claims. *See* SJ Opinion 32-46. In so ruling, the court concluded that the Government had breached its contractual obligation under the MPCI Policy to indemnify the Farmers' 2002 lost peanut crops at the 31 cent quota rate. The court reasoned that the Government, by the 2002 Farm Bill's repeal of the FSA's authority to allocate farm poundage quotas, had hindered the occurrence of a condition that would have given rise to coverage and indemnity at the 31 cent rate, and that the Government was thus barred from denying liability under the MPCI Policy. *Id.* at 35-38. The court also determined that neither the "sovereign acts doctrine" nor the "unmistakability doctrine" afforded the Government a valid defense to liability. *Id.* at 39-47.

With respect to the "sovereign acts doctrine," the court recognized that the Government would possess a valid defense to the Farmers' breach of contract claims if a "public and general" law prevented the occurrence of a condition giving rise to liability. SJ Opinion 39-42. It concluded, however, that the 2002 Farm Bill, in repealing the poundage marketing quota program, included a provision that "obviously and specifically targeted the contractual obligations under the peanut farmers' pre-existing crop insurance policies for the 2002 crop year." *Id.* at 44. The court concluded that "the reduction of insurance coverage was direct, not merely incidental to the accomplishment of a broader governmental objective." *Id.* (internal quotation marks omitted). It thus determined that the sovereign acts doctrine did not authorize the Government to escape liability for the Farmers' breach of contract claims. *Id.* at 46.

The court next concluded that, "because the [2002 Farm Bill] was not 'public and general,' the unmistakability doctrine does not apply." SJ Opinion 46. With respect to the due process claims, the court determined that the "plaintiffs' due process arguments are primarily based on their contract claims." *Id.* at 47-48. Concluding that it had "already discussed the plaintiffs' contract claim at length and found for the plaintiffs as to this claim," the court found it unnecessary to resolve the plaintiffs' due process claims. *Id.*[16]

---

[16]The district court also appears to have based its SJ Opinion, at least in part, on a theory of detrimental reliance. In its breach of contract anal-

2.

When the district court made its rulings in the SJ Opinion, several similar lawsuits were being pursued in other federal courts. One such proceeding, filed in the Court of Federal Claims on behalf of Farmers in Texas, Georgia, Alabama, Florida, and South Carolina, was dismissed on December 16, 2003, for lack of jurisdiction. On appeal, the Federal Circuit concurred in the jurisdictional ruling, but vacated the dismissal and remanded to the Court of Federal Claims for transfers of the lawsuits to the appropriate district courts. *Tex. Peanut Farmers Ass'n v. United States*, 409 F.3d 1370 (Fed. Cir. 2005). The Farmers in those cases then requested the MDL Panel to transfer their claims to the Eastern District of North Carolina, pursuant to 28 U.S.C. § 1407. The MDL Panel agreed, and transferred these and other cases to the district court "for coordinated or consolidated pretrial proceedings." J.A. 292 (citing 28 U.S.C. § 1407).[17]

On March 31, 2005, and December 20, 2006, the district court certified several additional district-wide classes in the MDL cases.[18] The class certification orders entered with respect to the MDL cases

ysis, the court concluded that "it was fundamentally wrong for the government to tell the farmers that they would have insurance coverage at $0.31 per pound for as many peanuts as the FSA declared to be quota peanuts, and then, after the farmers had planted their crops, to tell the FSA not to declare any quota peanuts." SJ Opinion 38.

[17]On October 26, 2004, the MDL Panel first transferred six MDL cases to the Eastern District of North Carolina for coordinated or consolidated pretrial proceedings. Thereafter, on June 21, 2006, the Panel transferred several additional MDL cases to the Eastern District of North Carolina. These lawsuits were consolidated in the Eastern District of North Carolina pursuant to 28 U.S.C. § 1407, which authorizes the judicial panel on multidistrict litigation to transfer civil actions involving one or more common questions of fact to a single district for "coordinated or consolidated pretrial proceedings." 28 U.S.C. § 1407(a).

[18]The ten additional district-wide classes certified by the district court in the MDL cases include Farmers in the Middle District of Alabama, the Northern District of Florida, the Southern and Middle Districts of Georgia, the District of South Carolina, the Northern, Southern, Eastern, and Western Districts of Texas, and the Eastern District of Virginia.

tracked the court's class certification ruling in the SJ Opinion in the North Carolina case — certifying district-wide classes of Farmers whose insured peanut crops were located within the district in which their cases had originally been pending. *See* MDL Order I at 3; MDL Order II at 5. The court also ruled that its SJ Opinion, rendering the Government liable on the Farmers' breach of contract claims, extended to each of the certified classes of Farmers in the MDL cases. *See* MDL Order I at 2; MDL Order II at 4.

On March 31, 2005, after receiving recommendations from the Farmers and the Government, the district court entered its Damages Order, explaining the formula it would apply to the calculation of the Farmers' damages. The formula first provided for the calculation of the Farmers' hypothetical 2002 farm poundage quota and non-quota amounts. This initial calculation was a necessary starting point because there had been no 2002 farm poundage quota allocations made to individual peanut farms. The Damages Order called for these hypothetical farm poundage quota and non-quota amounts to be determined by multiplying each individual Farmer's 2002 production guarantee by the district-specific percentage of quota liability for 2001 to arrive at a quota amount. *See* Damages Order 2. The amount of lost "quota" production for each Farmer was then multiplied by the difference between the 2002 rate for non-quota peanuts (17.75 cents) and the 31 cent quota rate that had been announced prior to the 2002 Farm Bill. *Id.* at 2-3.[19] After calculating the damage awards under this formula, the court, on December 20, 2006, entered Final Judgment for the Farmers in the aggregate sum of approximately $ 30.1 million.

3.

The district court's Final Judgment made its rulings appealable

---

[19]Although the court authorized reductions in this formula to account for unpaid premiums, it rejected the Government's contention that the damage awards should be further reduced by disaster relief payments the Farmers received to compensate for their 2002 peanut crop losses. The court also declined to deduct benefits received by the Farmers from the commodity assistance program that the 2002 Farm Bill authorized to replace the peanut quota program.

under Rule 54(b) of the Federal Rules of Civil Procedure, ordering as follows:

> [P]ursuant to Rule 54(b), . . . more than one claim for relief has been presented and multiple parties are involved, the Court hereby enters Final Judgment in favor of all plaintiffs and class members who presently have cases pending before this Court as to the breach of contract claim. The Court further finds that there is no just reason for delay.

The court thus determined that its judgment was final with respect to the breach of contract claims, and also found that there was no just reason for delay. The Government filed its notice of appeal on February 16, 2007, and the Farmers have cross-appealed. We possess jurisdiction pursuant to 28 U.S.C. § 1291. *See Sears, Roebuck & Co. v. Mackey*, 351 U.S. 427, 428-29 (1956).

## II.

We review de novo a district court's award of summary judgment, viewing the facts and inferences drawn therefrom in the light most favorable to the non-moving party. *Seabulk Offshore, Ltd. v. Am. Home Assurance Co.*, 377 F.3d 408, 418 (4th Cir. 2004). An award of summary judgment is appropriate only "if . . . there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue of material fact is one "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). We also review de novo a district court's assessment of an insurance policy, in that issues of contract interpretation constitute questions of law. *See Hendricks v. Central Reserve Life Ins. Co.*, 39 F.3d 507, 512 (4th Cir. 1994).

## III.

The Government's contention that the district court erred in awarding summary judgment to the Farmers on their breach of contract claims is premised on two basic propositions: (1) that the court erred by concluding that the MPCI Policy obligated the insurers to indem-

nify the Farmers at the 31 cent quota rate in the absence of 2002 farm poundage quota allocations having been made to individual farms; and (2) that the court incorrectly determined that the Government's failure to allocate such 2002 farm poundage quotas breached the MPCI Policy, based on its conclusion that the enactment of the 2002 Farm Bill hindered the performance of the Government's statutory duty to allocate such quotas. The Government also maintains that the court erroneously premised its SJ Opinion, in part, on the Farmers' alternative theory of detrimental reliance. As explained below, we agree with the Government that the district court erred in awarding summary judgment to the Farmers on their breach of contract claims.

A.

Before turning to the Government's contentions of error, we must first ascertain the body of law that applies to our analysis of these contract issues. As an initial proposition, "[w]hen the United States enters into contract relations, its rights and duties therein are governed generally by the law applicable to contracts between private individuals." *United States v. Winstar Corp.*, 518 U.S. 839, 895 (1996) (internal quotation marks omitted). And, as the Federal Circuit recently observed, "[i]t is customary, where Congress has not adopted a different standard, to apply to the construction of government contracts the principles of general contract law, which become federal common law." *Long Island Sav. Bank, FSB v. United States*, 503 F.3d 1234, 1245 (Fed. Cir. 2007) (internal quotation marks omitted). The Federal Circuit further concluded that "[t]he Restatement of Contracts reflects many of the contract principles of federal common law." *Id.*; *see also Mobil Oil Exploration & Producing Se., Inc. v. United States*, 530 U.S. 604, 608 (2000) (relying on Restatement of Contracts for principles of repudiation and restitution); *Franconia Assocs. v. United States*, 536 U.S. 129, 141-43 (2002) (applying principles of general contract law by relying in part on Restatement (Second) of Contracts). Both the district court and the parties in this litigation, through their reliance on the Restatement of Contracts and other general principles of contract law, have impliedly agreed that the contract principles of federal common law should govern this dispute. Because neither the Government nor the Farmers contend that Congress promulgated or mandated a different standard, we will apply such principles in our assessment of the breach of contract issues. *Cf. Battle v. Seibels Bruce*

*Ins. Co.*, 288 F.3d 596, 607 (4th Cir. 2002) (concluding that "the law is well settled that federal common law *alone* governs the interpretation of insurance policies issued pursuant to the [National Flood Insurance Program]"). We now turn to the Government's contentions of error on the district court's breach of contract rulings.

## B.

First, we agree with the Government that the MPCI Policy did not create any contractual obligation for the insurers to indemnify the Farmers for lost peanuts in 2002 at the 31 cent quota rate. Instead, the indemnity obligation at the quota rate was contingent on 2002 farm poundage quota allocations being made to individual peanut farms. Absent such 2002 allocations, there was no obligation under the MPCI Policy for the Farmers to be indemnified at the 31 cent quota rate. Put simply, to be indemnified at the 31 cent rate, an insured farm had to be assigned a 2002 farm poundage quota by the FSA. Because the FSA did not assign farm poundage quotas for the 2002 crop season, the Farmers were never insured at the 31 cent quota rate, and their claims were properly indemnified at the 17.75 cent non-quota rate. *See Studio Frames, Ltd. v. Std. Fire Ins. Co.*, 483 F.3d 239, 245 (4th Cir. 2007) (applying federal common law to interpretation of federal insurance policy and determining that "if the policy language in issue is clear and unambiguous, we apply it directly").

This interpretation is supported by the express terms of the MPCI Policy, which required each Farmer to file an "acreage report," detailing the farm's peanut acreage and the "effective poundage marketing quota, *if any*, that is applicable" to the farm for the current crop year. MPCI Policy Peanut Provision ¶ 6 (emphasis added). The MPCI Policy provides that "the effective poundage marketing quota, *if any*, for each unit" is not to exceed the farm poundage quota allotment — a provision that specifically contemplates the contingency of no quota allocations being made to an insured farm. *Id.* ¶¶ 1, 6 (emphasis added). As the Government asserts, the MPCI Policy was applicable to all insured peanut farms, including those that had not previously been allocated any farm poundage quotas. Thus, the MPCI Policy makes no promise to provide coverage and indemnification at the 31 cent quota rate in the absence of the FSA's allocation of 2002 poundage quotas to individual farms.

This point is further supported by the fact that, absent the 2002 farm poundage quota allocations, it would be impossible to insure the Farmers at the 31 cent quota rate. This is so because the MPCI Policy provides that "[t]he maximum pounds that may be insured at the quota price election" may not exceed "the effective poundage marketing quota" — defined in turn as a quantity of peanuts "not to exceed the Marketing Quota established by FSA for the farm serial number." MPCI Policy Peanut Provision ¶¶ 1, 3. As a result, if the FSA farm poundage quota for an insured farm is "zero," none of that farm's peanut crop is insured at the 31 cent quota rate.

The MPCI Policy's indemnity formula also supports the interpretation that, absent 2002 farm poundage quota allocations, the insurers have no obligation to indemnify the Farmers at the 31 cent quota rate. As noted above, the Policy's indemnity formula provides that the value of insured peanuts must first be computed by determining an insured farm's amounts of quota and non-quota peanuts (by subtracting the effective poundage marketing quota from the production guarantee), and then multiplying these amounts by their respective price elections. Thus, the MPCI Policy does not, absent the allocation of 2002 farm poundage quotas, authorize indemnification at the 31 cent quota rate. *See* MPCI Policy Peanut Provision ¶ 14. This point is illustrated by the fact that the district court was unable to calculate the Farmers' damages at the 31 cent quota rate without resorting to an extrinsic source, i.e., 2001 poundage quota amounts, in the formula provided by its Damages Order. *See* Damages Order 2-3.

The Farmers, on the other hand, maintain that the Government's announcements, as well as the MPCI Policy, contain both express and implied promises that the Farmers would be indemnified at the 31 cent quota rate for what should have been their lost 2002 farm poundage quota peanuts, and that enactment of the 2002 Farm Bill and the Government's handling of their indemnity claims breached those promises. In particular, the Farmers point to the MPCI Policy provision that coverage will not be reduced:

> In addition to the price election or amount of insurance available on the contract change date, we may provide an additional price election or amount of insurance no later than 15 days prior to the sales closing date . . . . These addi-

> tional price elections . . . will not be less than those available
> on the contract change date.

MPCI Basic Policy ¶ 3(e); *see also id.* ¶ 4 (providing that any changes in policy provisions, including price elections, will be provided no later than the contract change date, except that price elections may be offered after that time in accordance with paragraph 3). As noted above, the 2002 Farm Bill specifically altered the price election (although expressly for *non-quota peanuts* only), by providing that

> the non-quota price election . . . shall be 17.75 cents per
> pound and shall be used for all aspects of the policy relating
> to the calculations of premium, liability and indemnities.

2002 Farm Bill § 1310(c)(2). Put succinctly, under the 2002 Farm Bill, all peanuts were "non-quota peanuts." The Farmers, however, contend that the alteration to the price election for non-quota peanuts made by the 2002 Farm Bill was in fact a change to the price election for quota peanuts — reducing overall coverage and directly contravening the MPCI Policy Peanut Provisions. *See* MPCI Policy Peanut Provision ¶ 3 (providing that "additional price elections . . . will not be less than those available on the contract change date"). Because the price election of 17.75 cents, as specified in the 2002 Farm Bill, actually *raises* the price election for non-quota peanuts, we disagree with the Farmers on this point. This aspect of the 2002 Farm Bill thus does not constitute a breach of the MPCI Policy.

The Farmers nevertheless contend that section 1310(c) of the 2002 Farm Bill not only altered the price election, it did so after the date specified for such alterations in the MPCI Policy. Even if the terms of the MPCI Policy were somehow violated when the 2002 Farm Bill raised the price election for non-quota peanuts after the Policy's deadlines, we would decline to award relief on that basis. Put simply, the Farmers cannot demonstrate that the increase made by the 2002 Farm Bill to their indemnity for non-quota peanuts (to 17.75 cents), even if made after the change date specified in the Policy, resulted in an injury to them. *See, e.g.*, *Santana, Inc. v. Levi Strauss & Co.*, 674 F.2d 269, 275 (4th Cir. 1982) (concluding that, in order to maintain action for breach of contract, plaintiff must show that alleged breach caused

injury, and finding no injury occurred when alleged breach benefited plaintiff).

The Farmers' primary contention, of course, is not that the 2002 Farm Bill raised the indemnity rate for non-quota peanuts, but that the Government was able to avoid indemnifying them at the 31 cent quota by enactment of the 2002 Farm Bill. Although the MPCI Policy provides that "additional" price elections may be offered after the contract change date, the Farmers' contention that the 2002 Farm Bill *replaced* the price elections available under the MPCI Policy (rather than offering additional ones) is unpersuasive. In the absence of farm poundage quotas being allotted to individual farms, the Farmers were unable to avail themselves of the 31 cent quota rate, regardless of whether the 2002 Farm Bill replaced that rate or simply provided price elections in addition to it.

We are similarly unpersuaded by the Farmers' contention that the two USDA announcements of December 14, 2001, and January 15, 2002, made express or implied warranties to them with respect to the 2002 farm poundage quotas for peanuts. Although the USDA announcements indicated that the 2002 national poundage quotas would remain the same as in the previous year, and that such quotas would be allocated to eligible farms in the future, the announcements explicitly warned the Farmers that Congress was considering a Farm Bill that would change the peanut price support program by eliminating poundage quotas. Importantly, these announcements specified that, if the 2002 Farm Bill was enacted, the national poundage quotas for peanuts would be either altered or rescinded.

In these circumstances, we agree with the Government's contentions, and reject those of the Farmers'. Although we have great sympathy for the hard-working peanut farmers of this country, our obligation is to rule on the basis of the factual underpinnings and the applicable legal principles. The MPCI Policy and the USDA's announcements neither expressly nor impliedly promised to indemnify the Farmers at the 31 cent quota rate, absent farm poundage quota allocations being made by the FSA for the 2002 crop year. The MPCI Policy thus did not, absent 2002 farm poundage quota allocations being made to individual farms, create a contractual obligation on the part of either the Government or the insurers to indemnify the

Farmers for their 2002 peanut crop losses at the 31 cent quota rate. *See Studio Frames, Ltd. v. Std. Fire Ins. Co.*, 483 F.3d 239, 245 (4th Cir. 2007) (applying federal common law to interpretation of federal insurance policy and determining that "if the policy language in issue is clear and unambiguous, we apply it directly").

### C.

Our analysis of the Farmers' breach of contract claims does not end here, however. The district court, in part, premised its finding of a breach on the legal principle that, in the proper circumstances, a contract condition (here, the allocation of 2002 farm poundage quotas) may be excused if the promisor prevents or hinders the occurrence of the condition and it would have otherwise occurred. Accordingly, although the court appears to have concluded that, under the terms of the MPCI Policy, the Government was not obligated to indemnify the Farmers at the 31 cent quota rate, the court nevertheless found a breach by the Government, concluding that it had prevented the FSA from allocating farm poundage quotas to individual farms for the 2002 crop year. In its ruling, the court relied for this conclusion on section 295 of the Restatement (First) of Contracts, which provides:

> If a promisor prevents or hinders the occurrence of a condition, . . . and the condition would have occurred . . . except for such prevention or hindrance, the condition is excused, and the actual or threatened nonperformance of the return promise does not discharge the promisor's duty, unless . . . (a) the prevention or hindrance by the promisor is caused or justified by the conduct or pecuniary circumstances of the other party.

SJ Opinion 35-36 (citing Restatement (First) of Contracts § 295 (1932) as quoted in *Powers v. Sims & Levin*, 542 F.2d 1216, 1226 (4th Cir. 1976) (Winter, J., concurring and dissenting)). Based on this Restatement provision, the court concluded that such a hindrance had occurred when the 2002 Farm Bill, enacted on May 13, 2002, eliminated the statutory directive to the FSA to allocate farm poundage quotas to individual farms for each crop year. *Id.* at 36-38 (citing 7 U.S.C. § 1358-1(b)(1)(A) (2001)). The court further concluded that, as "the FSA would have assigned the farm poundage quotas had the

[2002 Farm Bill] not prevented or hindered it from doing so, the [requirements] of § 295 [are] met." *Id.* at 35-36.

Although Judge Parker recognized years ago, in *Fuller Co. v. Brown*, that "[i]t is a principle of fundamental justice that if a promisor is himself the cause of the failure of performance . . . of a condition upon which his own liability depends, he cannot take advantage of the failure," *see* 15 F.2d 672, 678 (4th Cir. 1926) (quoting 2 *Williston on Contracts* § 677), that legal principle is inapplicable to this appeal. The indemnification of the Farmers under the MPCI Policy did not "depend" on FSA's allocation of 2002 farm poundage quotas. The district court thus erred in excusing what it viewed as the "condition" of 2002 farm poundage allocations. A "condition," as defined by the Restatement (Second) of Contracts, is "an event, not certain to occur, which *must* occur, unless its non-occurrence is excused, *before* performance under a contract becomes due." Restatement (Second) of Contracts § 224 (emphasis added); *see also* 13 *Williston on Contracts* § 38:7 (4th ed. 2006) ("A condition precedent is either an act of a party that must be performed or a certain event that must happen before a contractual right accrues or contractual duty arises."); *Moore Bros. Co. v. Brown & Root, Inc.*, 207 F.3d 717, 725 (4th Cir. 2000) ("The prevention doctrine is a generally recognized principle of contract law according to which if a promisor prevents or hinders fulfillment of a *condition to his performance*, the condition may be waived or excused." (emphasis added)).[20]

The only condition to the indemnification of the Farmers under the MPCI Policy was the occurrence of a natural cause of covered loss. *See* MPCI Policy Peanut Provision ¶ 11 (providing coverage for loss caused by, inter alia, adverse weather conditions, fire, insects, plant disease, wildlife). When a covered loss occurs, the obligation of the insurer to indemnify under the MPCI Policy is triggered. There is,

---

[20]In addition to not being a "condition" to its performance under the MPCI Policy, the Farmers failed to demonstrate that the Government made an enforceable promise to allocate poundage quotas to individual peanut farms. As the Restatement (Second) of Contracts provides, "[n]on-occurrence of a condition is not a breach by a party unless he is under a duty that the condition occur." Restatement (Second) of Contracts § 225.

however, no Policy provision that conditions such indemnification on whether farm poundage quotas are allocated to an individual farm for a particular crop year. Instead, the farm poundage quota allocations simply play a role in the *computation* of the indemnification to be paid to the Farmers for their covered losses. Thus, the Government is also correct on this point — performance under the MPCI Policy is not conditioned on the allocation of farm poundage quotas by the FSA.

Importantly, our conclusion on this contention is supported by the fact that the Farmers have already been indemnified for their 2002 crop losses under the MPCI Policy — although they were indemnified at the non-quota rate of 17.75 cents, rather than at the 31 cent quota rate they seek in this litigation. Thus, the Government did not hinder the occurrence of any condition that had to occur before an indemnification obligation under the MPCI Policy was triggered. Indemnification was due when the Farmers presented their claims for covered losses under the MPCI Policy, and the insurers performed under the Policy by indemnifying those losses at the non-quota rate of 17.75 cents.

Because the allocation of the 2002 crop year farm poundage quotas was not a "condition" of performance under the MPCI Policy, we disagree with the SJ Opinion on this issue. Although the 2002 farm poundage quota allocations were an essential precursor to the Farmers being indemnified at the 31 cent quota rate, they were not a condition to the insurers' performance under the coverage and indemnification provisions of the MPCI Policy. As a result, the district court erred in concluding in its SJ Opinion that a breach of the MPCI Policy occurred, and in awarding summary judgment to the Farmers on their breach of contract claims. We must therefore vacate the court's ruling in this regard.[21]

---

[21]The Government also argues that the district court erred in its application of the unmistakability and sovereign acts doctrines. These doctrines create exceptions from government liability when a breach is caused by an act of the government. Because, as explained herein, the Government is not liable for any breach of the MPCI Policy, we need not assess assertions in this regard.

## D.

Finally, the Government disagrees with the Farmers' alternative contention that they are entitled to indemnification for their crop losses at the 31 cent rate because they had expended substantial sums of money and resources in reliance on the MPCI Policy and on the USDA announcements (which had forecast allocations of poundage quotas in 2002 at the same rates and percentages as in earlier years). Such reliance by the Farmers included, inter alia, planting their peanut crops, entering into leases and bank loans, foregoing other farming options, and cancelling other insurance coverage. Because the peanut quota program was not repealed by the 2002 Farm Bill until after the announcement of the national poundage quota for the 2002 crop year — when the MPCI Policy was already final and after the beginning of the 2002 planting season — the Farmers contend that they are entitled to recover their damages. The elements of such a detrimental reliance claim are: (1) a promise, (2) which the promisor should reasonably expect to cause action by the promisee, (3) which does cause such action, and (4) which should be enforced to prevent injustice to the promisee. *C & K Petrol. Prods., Inc. v. Equibank*, 839 F.2d 188, 192 (3d Cir. 1988) (citing Restatement (Second) of Contracts § 90).

The Government asserts, on the other hand, that the Farmers' unilateral expectation that farm poundage quota authority would remain in effect for the 2002 crop year does not afford them any basis for imputing to the MPCI Policy an implied promise to indemnify at the 31 cent quota rate. *See Maccaferri Gabions, Inc. v. Dynateria Inc.*, 91 F.3d 1431, 1444 (11th Cir. 1996) (looking to Restatement (Second) of Contracts § 90 and concluding that "[i]t is axiomatic that a plaintiff cannot recover for reasonable, detrimental reliance on a promise without proving that the defendant made the promise"). Furthermore, the Government contends that the Farmers could not reasonably rely on the fact that poundage quota allocations were made in previous years, because earlier amendments to farm support programs clearly indicated that the peanut quota program was subject to congressional modification.

Modifications to government programs by congressional action are not at all out of the ordinary, and had indeed occurred recently in the

context of the peanut quota program. For example, in 1996, Congress barred the allocation of such quotas to farms controlled by public entities or non-producers residing out of state. *See* Federal Agriculture Improvement and Reform Act, Pub. L. No. 104-127, § 155(i)(1)(A)(v), 110 Stat. 888, 927 (1996) (adding 7 U.S.C. § 1358-1(b)(1)(D)). Similarly, Congress eliminated statutory provisions establishing specific minimums on the national poundage quota, an amendment that substantially reduced the peanut quota allocations to individual farms. *Id.* § 155(i)(2) (amending 7 U.S.C. § 1358-1(a)(1)). Accordingly, as the Government asserts, there has been a "'persistent congressional refinement of the peanut quota program.'" Br. of Appellants 29 (quoting *Members of the Peanut Quota Holders Assoc. v. United States*, 60 Fed. Cl. 524, 530 (Ct. Fed. Cl. 2004)).

Finally, the USDA's warnings of forthcoming alterations or revisions to the peanut quota program, received by the Farmers in late 2001 and early 2002, substantially undermine their reliance contentions. As detailed above, the events immediately preceding the 2002 crop year made clear to the Farmers that congressional action on the peanut quota program was likely to occur. For example, in its December 14, 2001 announcement of the national poundage quota for peanuts, the USDA warned:

> The Farm Bill currently being considered by Congress would dramatically change the peanut program. Poundage quotas would be eliminated and price support would be replaced with a target price and deficiency payment plan. *If pending legislation is enacted as law, the 2002 poundage quota and price support announced by this release may be altered or rescinded.*

J.A. 75 (emphasis added). Similarly, in its January 15, 2002 announcement, the USDA again warned that "[t]he Farm Bill currently being considered by Congress would change the peanut program . . . . *If pending legislation is enacted as Law for 2002, the 2002 poundage quota announced according to this notice will be altered or rescinded.*" J.A. 78 (emphasis added). Significantly, legislation repealing the peanut quota program had passed the House of Representatives in October 2001, well before the MPCI Policy for the 2002 crop year became final. *See* 147 Cong. Rec. H6407 (Oct. 5, 2001).

In these circumstances, the Farmers were on ample notice in late 2001 and early 2002 of the possibility — indeed, the likelihood — of major changes (i.e., alteration or rescission) being made to the peanut quota program. Although the timing of the 2002 Farm Bill was unfortunate for the Farmers, their assertions of reliance on the 2002 farm poundage quota allocations being made to individual peanut farms are misplaced, particularly when viewed in the context of the specific announcements of the USDA.[22]

## IV.

Pursuant to the foregoing, we vacate the district court's award of summary judgment to the Farmers and remand for such further proceedings as may be appropriate.

*VACATED AND REMANDED*

---

[22]In light of our disposition of these appeals, we need not reach the Government's assertions of error concerning the Damages Order. To the extent the Farmers seek to pursue the class and venue contentions they have raised on cross-appeal, the district court may revisit these issues in light of this opinion.